261 S.W.2d 58 (1953)
COLLINS
v.
SHIVE et al.
No. 43325.
Supreme Court of Missouri, Division No. 1.
September 14, 1953.
Motion for Rehearing or to Transfer to Denied October 12, 1953.
Thurman, Nixon & Blackwell, J. W. Thurman, Jeremiah Nixon, Hillsboro, for appellants.
*59 Richeson & Carr, Samuel Richeson, Robert L. Carr, Potosi, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied October 12, 1953.
LOZIER, Commissioner.
Action to quiet title to real estate, establish a constructive trust and set aside certain conveyances for fraud. Defendant Williams died prior to trial time and defendants Allans (husband and wife) defaulted. The trial court found that plaintiff was the fee simple owner, subject only to a certain lien claimed by defendant M. A. Rust & Sons Realty Co. Only defendants Shive and the United Bible Institute (a religious-benevolent corporation) appealed.
Defendants-appellants contend that: The petition does not state a claim upon which relief can be granted; the alleged trust was not shown by clear, cogent and convincing evidence; all subsequent purchasers, as innocent purchasers without notice, were not chargeable with a constructive trust; plaintiff was guilty of laches.
The land involved, a 238 acre farm in Washington County, was conveyed to the Institute in July 1945 for $3,700, the Institute executing a (part purchase money) $2,200 deed of trust to O. F. Klaus, trustee for G. A. Johnson and wife Edith. On January 9, 1950, the Institute conveyed 60 acres to the Allans who executed two deeds of trust thereon to defendant E. G. Rust, trustee for defendant E. Rileyone for $1,300 and one for $1,500. (The $1,300 was part purchase money; $1,400 of the $1,500 was used to satisfy the Johnson deed of trust.) On February 10, 1950, the Institute conveyed the other 178 acres to the Allans who executed a (part purchase money) $1,600 deed of trust to Rust, trustee for Miss Riley. In August 1950, the $1,500 deed of trust on the 60 acres was foreclosed and Williams purchased for $2,500. In September 1950, Williams conveyed the 60 acres to defendant Celeste V. Boyce.
We can here quickly dispose of the matter of the Rust Company's lien. The deceased Williams, the Misses Riley and Boyce were employees, and Rust was an officer, of the Rust Company, for which all four had acted as straw parties. Plaintiff offered no evidence in support of his allegations of conspiracy between Shive and the company (which handled the transactions for Shive and the Allans) or its straw parties who, under defendants' evidence (including Shive's), acted in good faith. Rust and Miss Boyce first heard of plaintiff's claim when their depositions were taken some two months before the trial. Miss Boyce did not know the Allans or Williams, and did not know either plaintiff or Shive before her deposition was taken. Miss Riley had met Shive and the Allans in the company's office. The company's records showed that: the Allans purchased the 60 acres for $3,000, paid $200 "earnest money" and $115 closing charges; the company paid the $200 to the Institute; the company paid $1,400 of its own funds to satisfy the Johnson deed of trust and sold, repurchased and foreclosed the $1,500 deed of trust and bought at the trustee's sale for $2,500; the company expended part of the $1,000 surplus for interest, taxes, insurance and repairs and holds "the few dollars left * * * in trust for someone." The company still has the $1,300 and $1,600 deeds of trust (both of which it originally held as additional security for the $1,500 deed of trust) but claims no interest therein. According to Shive, the Allans were bona fide purchasers. The company's claim was supported by substantial, uncontroverted evidence and defendants-appellants Shive and the Institute do not now challenge the propriety of that claim. We concur in the trial court's allowance of the lien for $1,635 with 6% interest per annum from January 9, 1950.
Plaintiff alleged that: For 12 years prior to August 1, 1946, he had worked for Shive as a rat and pest exterminator in St. Louis and had been paid only about $100; he and Shive had an oral agreement that Shive "would retain plaintiff's earnings until an amount sufficient had accumulated to pay for a home for plaintiff"; in 1945, plaintiff desired to purchase a house on Semple Avenue in St. Louis but Shive *60 persuaded him that he should buy the Washington County farm, to which he consented and agreed that Shive "should use plaintiff's money then in" Shive's hands for that purpose; thereafter Shive, "with funds belonging to plaintiff," purchased the farm and, "unknown to plaintiff wrongfully and fraudulently and for the purpose of defrauding plaintiff caused the said deed to be made in the name of" the Institute, of which Shive was the president; Shive "informed plaintiff that he had purchased a home for plaintiff"; on August 1, 1946, plaintiff moved to the farm and has been in exclusive possession ever since; Shive, "wrongfully, fraudulently and for the purpose of injuring and defrauding plaintiff," caused the Institute to execute the two conveyances to the Allans; Shive, "conspiring" with the Institute and the Allans "to injure and defraud plaintiff," caused the Allans to execute and deliver the $1,500 and $1,600 deeds of trust; Shive, the Allans, Rust, Miss Riley and Williams, "acting in concert and in conspiracy to injure, wrong and defraud plaintiff of his property," caused the $1,500 deed of trust to be foreclosed and Williams to purchase at the trustee's sale; Miss Boyce, Williams' grantee, took with knowledge of plaintiff's rights; the Rust Company claimed an interest the nature of which was unknown to plaintiff; at all times all defendants had notice of plaintiff's rights and claims. Plaintiff prayed cancellation of the $1,500 deed of trust and that defendants be declared to hold title as trustees for plaintiff.
We rule adversely to defendants-appellants Shive and the Institute (hereinafter called defendants) their contention that the trial court erred in overruling their pre-trial motion to dismiss the petition for failure to state a claim upon which relief could be granted. Defendants point to the absence of any allegation that plaintiff's remedy at law was inadequate. Pleading that bare legal conclusion "would serve no purpose." Burton v. Helton, Mo. Sup., 257 S.W. 128, 129[1]. Equity's jurisdiction hinges upon whether the petition, seeking equitable relief, affirmatively shows "by the statement of facts," that plaintiff's law remedy was inadequate. Palmer v. Marshall, Mo.App., 24 S.W.2d 229, 233[2]. See also In re Connor's Estate, 254 Mo. 65, 162 S.W. 252, 254, 49 L.R.A.,N.S., 1108; Boynton v. Boynton, 186 Mo.App. 713, 172 S.W. 1175, 1176; State ex rel. Barnett School Dist. No. 66, Laclede County, v. Barton, Mo.App., 104 S.W.2d 284, 288[7, 8]. Defendants argue that the pleaded facts show only a claim against Shive for money had and received. However, plaintiff's allegations, if true, required cancellation of deeds for fraud, an exclusively equitable remedy. "There cannot be in the very nature of things an adequate remedy at law as a substitute for such an action in equity." Morris v. Hanssen, 336 Mo. 169, 78 S.W.2d 87, 91[4].
Defendants concede that the petition, "in alleging fraudulent connivance among the numerous defendants and schemes to defraud plaintiff of his rights, pleaded the elements of a constructive trust." But, they argue, there were other allegations indicating the existence of a resulting trust; "a pleading that does not clearly set forth the theory upon which the pleader is proceeding is subject to a motion to dismiss and is fatally defective." However, the "mere absence of a definite theory as to the nature of the cause of action alleged and the relief sought ordinarily is not a ground for demurrer, and a demurrer for failure to state a cause of action will not be sustained if the plaintiff's pleading is good on any theory." 71 C.J.S., Pleading, § 232, p. 455. See 41 Am.Jur., Pleading, Sec. 81, p. 347.
Plaintiff testified that he was a 51 year old uneducated Alabama Negro, and started "peddling" Shive's roach powders in St. Louis about 1931. He retained some of the money collected. As to compensation, Shive "told me he was going to keep it and when I found a place to suit me * * * he was going to buy it for me." In 1934 plaintiff started working for Shive in insect and rodent extermination work, and did that work until he moved to the farm in 1946. Shive did not pay him. "He said *61 that his home was in debt and when he had paid for his home then we would look around and find a farm for me, a home; * * * if I would stick with him he would stick with me until my home was completed the way I wanted it." Shive once told plaintiff that the business brought in $600 or $650 monthly. During all that time Shive paid plaintiff only $130. Plaintiff worked for Shive in his off hours as he had other employment. "I * * * done this in order I might pay for my home * * *." Plaintiff kept no records. Other than the $130, plaintiff never asked Shive for money and did not know how much Shive owed him. On several occasions, Shive told him "he was going to see I had my home" and once said, "You have been with me and I am with you until your home is complete." He said, "Here is the reason we don't draw up any writing, if a man's word ain't no good, he ain't no good anyhow."
All plaintiff knew about the Institute was what Shive told him and, so far as he knew, Shive was the Institute; plaintiff had no contact with the Institute or any of its officers except Shive; neither the Institute nor any of the board of directors had entered into a contract with him to purchase him a home. Shive once wrote him that plaintiff was on the board and was vice-president, and did not thereafter write or tell plaintiff that he had been taken off the board. Plaintiff attended no board meetings.
Once plaintiff was talking to Shive about buying a house on Semple Avenue. "I saw a picture on the wall at his home and I said, `There is the thing I want.' He said, `What is that?' There was a wagon loaded with hay, a man was standing on top and chickens around. I said, `That is what I want, a farm, a nice little home.' He said, `You shall have that.' He found it and he * * * called me * * * and said, `Collins, I see the thing you said you wanted. * * * I am going down and look at it.' * * * I had wrote down what I wanted, a house, a granary and a nice red barn. When he * * * came back * * * he said `What you said you wanted, I have found it. * * * Everything is there with the exception of the barn being red and you will have to make it red,' and he bought ten gallons of red paint in order that I make the barn red." The two went to the farm and plaintiff told Shive that it was what he wanted.
Plaintiff moved to the farm on August 1, 1946, and has been there ever since. He claimed to be the owner"I thought I was." He cleared ground, cut sprouts, had livestock and chickens and repaired old and built new fences. No one made any effort to interfere with his possession other than: "Mr. Allan came down there and said he had bought the farm * * *. I said, `Who told you you had bought it? There was no one here to see me.' He said, `I bought it. I bought it to move on.' I told him he was not going to move on there until I knew where I stood because I had money tied up in it and I wanted my home or my money for my labor." Plaintiff told Allan that he (Allan) "wasn't going to live on the place because it was my home and he wasn't going to move on there with me until I knew what was what." Allan neither returned nor notified plaintiff to vacate.
E. H. Britan, a Wichita, Kansas, minister, testified that Shive wrote him saying a 240 acre farm was in the name of the Institute and invited him to come there, "be on the board of directors and develop this farm as Christian work." Britan came to St. Louis in April, 1947, and agreed to set up a press at the farm and print religious tracts. Shive discussed establishing a boys' home. "He told me that Collins had worked for him for eleven years without a salary, that he had promised Mr. Collins that if Collins would stay with him until Shive's home was paid for, then they would buy a place for Collins and they bought this farm for a home for Collins and he made arrangements so as to put Collins on the board of directors, so that no one could run him off. He went into details about that to make it clear to me that while I was to have charge of the farm and all *62 that, that Mr. Collins was to be there and that was to be his home." Britan stayed at the farm 6 to 8 weeks.
Shortly after his arrival, Britan found that plaintiff was claiming ownership. He asked plaintiff "questions to find out what his status was. * * * I wanted to bring this thing out in the open in the presence of both parties. * * * I either wanted to correct the thing or get off of it (the board of directors)." Once, in April 1947, Britan "was telling Mr. Shive that he was not being square with Mr. Collins and Mr. Collins overheard it. I arranged the meeting because I wanted both parties present. * * * I told him he (Shive) was saying that Collins was in possession under the Institute; and Collins was saying it was his own possession. * * * Collins was under the impression that the farm was his own farm * * *." Later Shive told Britan to leave because he "was causing trouble between him (Shive) and Mr. Collins."
Plaintiff's version of Britan's "get-the-two-together" conversation was: "I just heard him (Shive) and he told Mr. Britan to hush something, to leave that alone. He never did get it out just what it was. Until afterwards I didn't realize he said that" the farm "was bought in the name of the Institute." Plaintiff "was very much tore up, didn't know just where I stood. * * I began to ask Mr. Shive for my deed. * * * Well, he said, `We want to put it in a big institute.' I said, `Yeah, but where is my home? * * * Where is the deed to my home?' He said, `You don't get a deed to a home bought like that.' I said, `Your home is like that, Mr. Shive, and I want a deed to my home just like the deed you have to yours.' * * *." Plaintiff said that he continued to tell Shive, "I want my home, where is it," and wrote him 4 or 5 letters.
From Shive's letters to plaintiff: From one (undated), "I will do everything in my power to help you * * *. I want to see you have a home." From one, dated October 31, 1946, "If our plans had gone through * * * you would have been this daysitting up there on Semple Avenue in a little 4-room house * * *." From one dated May 3, 1948: "I have another opportunity to make a deal on the farm * * * and if it goes through * * * the Bible Institute will be out of debt, I will be out of debt and the farm can be deeded to you and your wife. * * You know we cannot cut a stick of wood until the note is paid off and the mortgage lifted. This I'll have to do first. Pay off all the debt. Then we will go to a lawyer and he will draw up the contract and give you and your wife a contract for a deed. Then when you have finished the wood cutting, then the same lawyer will take up the contract for the deed and make you and your wife a warranty deed and then the farm will be yours with no debts against itall paid for. * * * Collins, I would like to have a strip one acre wide across the south end of the farm,can we arrange this in some wayfigure this out and in this wayyou can still have over two hundred acres in your farm and I can have a place yet to build a boys camp. This will give you all the buildingspractically all the cleared land for your farming." (This was written over a year after plaintiff said he began "asking for his deed," over a year before the board of directors authorized Shive to sell, over 18 months before the conveyances to the Allans and about 3 months before plaintiff wrote the letter referred to in the next paragraph.)
In a letter from plaintiff to Shive, dated August 10, 1948 (defendants' exhibit), plaintiff stated that Johnson (the beneficiary in the Institute's $2,200 part purchase price deed of trust) had been at the farm. "Now you told me that if I wanted the farm I could have it in the same way that you had it but we would have to sign up as you did before. * * * Now I will pay him this note here if you will do as you wrote my wife & told her that you would turn the whole farm over to us. * * * Mr. Johnson * * * said there was only $18.00 Hundred left for me to pay."
Whithouse, general store proprietor and postmaster at Fletcher, said that Shive told *63 him that if plaintiff "wanted to buy anything let him have it. He always knows where he can put his fingers on the money." Baker, an adjoining landowner, said that Shive told him that "Collins had been with him a long time; * * * and he was going to buy a place for Collins to own." Thebeau, another adjoining landowner, said that Shive told him that "Collins helped him pay for his (Shive's) place, he would see that Collins' place was paid for." Rusan, a neighbor, said that Shive told him "he had bought a place up there and was going to make kind of a home for poor people. * * * He told me he was moving a colored man up there. * * * `He is a good man.' He said, `I have had him 11 or 12 years.'"
Once Shive made a speech at a birthday party given for plaintiff. According to Mrs. Batey, plaintiff's sister, Shive said, "he had known him nine years * * * and that him and Mr. Collins was in the exterminating business and that he was going to take the money and buy a farm for Mr. Collins. Mr. Collins had helped him pay for his home and he was going to take and buy Mr. Collins a home * *." Mrs. Hodge heard Shive say "he and Mr. Collins were buying a farm and that he had never caught Mr. Collins in a lie."
Shive testified: He was a minister and had known plaintiff since 1935; plaintiff bought the extract "on a promise to pay; * * * he never paid anything"; later on, "everything he did, if I furnished the material and he did the work, he got half of it. * * * It went on for years. I handed him dollars, ran into hundreds of dollars"; still later, Shive "turned the business over" to plaintiff and "he would do it on a 50-50 basis. He would draw so much a week, half of the business was his and half was mine." Shive, like plaintiff, kept no records.
Shive denied that he ever had a contract with plaintiff whereby, in consideration of plaintiff's work, Shive would compensate him by buying him a home. Shive's version was: He told plaintiff, "Collins, I can't buy you a home, my home is not paid for. But * * * if you will go on and work and build this business up, when I get my home paid for then my signature will be good and I can help you make the down payment. You can go on and get your home that way." Shive did not recall the 1944 conversation (in which plaintiff said he discussed the Semple Avenue house but decided upon a farm with "a nice red barn") but admitted that he had talked to plaintiff about the Semple Avenue house.
Shive said that: When he organized the Institute he "had in mind that the corporation's function primarily would be to provide summer recreation for wayward boys; except for a few small donations, the Institute was wholly supported by him out of income from his extermination business and sole source of income; the corporation "never done anything except acquire the farm and deed it to Allan"; he (Shive) furnished the money with which the farm was bought; in June 1949, the board authorized him to sell; he negotiated the sale to Allan and took the Allans to the office of the Rust Company which prepared the documents; the sale price of the 60 acres was $3,000, and the sale price of the 178 acres was either $3,000 or $3,200; the Institute received very little cash, perhaps $54 out of the first sale"it all went in to pay off the expenses"; he told Rust that "anything coming to the Institute would," after payment of claims, be divided "up equal among each person who" had contributed to the Institute; plaintiff had no agreement with the Institute"all the agreement Mr. Collins had was with me personally." Shive once testified positively that plaintiff was a board member for a year but later said that he "might have written Collins something about taking" the place of Ayers (a board member since the incorporation) "but Ayers did not resign."
Shive said that, after the purchase of the farm, plaintiff "wanted to go there and the board objected. I prevailed * * * and they said, `We will let him go down there and take over under your supervision.'" Thereafter, according to Shive, he *64 and plaintiff agreed that plaintiff and his family would move to the farm. "He was to cultivate the farm for half, * * * he got one-half and the Institute got one-half, not me. No share was going to me at all, all of it went back to the Institute." However, plaintiff did not carry out his part of the agreement and the Institute "never received one cent." He told plaintiff he was going to use the farm for boys' recreation and plaintiff "was agreeable" and asked Shive to bring some colored boys and place them under plaintiff's supervision.
Shive denied telling Baker, Thebeau or anyone else that he was "buying this farm for Mr. Collins." In fact, Shive said, he was not buying the farm. "I could not give Mr. Collins the farm. * * * I was authorized by the board to manage the farm and I dealt with them on that. I had no authority to buy a farm or give a farm under the name of the Bible Institute."
According to Shive, Britan, "started the whole thing." Britan "became dissatisfied, wrote me a pretty strong letter. * * * Collins was very dissatisfied. I went down there and saw Collins * * * and asked him about the letter * * * and said, `What does this mean?' He said, `I don't know anything about it.' I dropped it at that." Britan "seemed to think I should give Collins the farm * * *. Collins told him he had done a lot of work and he had done this, that or the other and that I promised to give him the farm and that I should do it." Shive denied that Britan's "get-the-two-together" conversation was had.
According to Shive, the Allans were bona fide purchasers whom he discovered. Shive said that he knew nothing about the foreclosure of the $1,500 deed of trust and denied that he had entered into any agreement with the Allans or the Rust Company "for the purpose of defrauding Mr. Collins out of that property. * * * We offered Mr. Collins the farm; he could buy it himself if he wanted to, the same as anyone else. * * * We notified him the farm was for sale and he had the same privilege to buy as anyone else did." On two or three occasions, Shive said, he negotiated with and attempted to sell to plaintiff. Not to Shive's knowledge had Collins ever told Rust, the Rust Company or Allan that he claimed ownership.
We agree with defendants that the "evidence to establish a constructive trust must be so clear, cogent, unequivocal and positive as to banish doubt from the chancellor's mind." Thomason v. Beery, Mo. Sup., 235 S.W.2d 308, 312[5]. But we do not agree that plaintiff failed to sustain his burden of proof in this respect. The primary contested factual issue before the trial court was, and before this court is: What was the agreement under which plaintiff worked for Shive for many years? Which version should be creditedplaintiff's or Shive's?
"In the review of the instant case, an equitable action, the appellate court determines the cause de novo, weighing the evidence introduced upon the factual issues; but the appellate court usually defers to the findings of the trial chancellor where there was conflicting verbal testimony involving the judging of the credibility of the witnesses who appeared before him." Starr v. Mitchell, 361 Mo. 908, 237 S.W.2d 123, 126[5, 6]. Here, we defer to the trial court's determination that plaintiff was the more credible witness. Furthermore, the overwhelming weight of the evidence (above summarized) in the "cold record" strongly supports plaintiff's version. We need here refer only to Shive's own admissions, made in letters to plaintiff and in oral statements to disinterested persons. The clarity, cogency and persuasiveness of the evidence conclusively and undoubtedly establish Shive's constructive trusteeship. The chancellor, in equity and in the prevention of injustice and fraud, correctly rendered a decree in plaintiff's favor.
Defendants contend: "Subsequent purchasers of the property were innocent purchasers for value and hence were not *65 chargeable with any trust." However, neither of the appealing defendants (Shive and the Institute) were subsequent purchasers; the lien of the Rust Company (an innocent purchaser without notice) has been upheld; and the Allans did not appear to assert any interest. This assignment is overruled.
Defendants contend that plaintiff was guilty of laches in failing to bring his suit until 3 years and 7 months after he first learned that Shive had taken the title in the name of the Institute. Defendants argue that all of the subsequent transactions were had without knowledge on the part of Shive, the Institute, the Allans or the other defendants that plaintiff was claiming the property. We consider this matter only as to the appealing defendants, Shive and the Institute. See Stephenson v. Stephenson, 351 Mo. 8, 171 S.W.2d 565, 568. Defendants concede that "mere passage of time, particularly where the time does not exceed the statute of limitations, is not sufficient to establish the defense of laches," and that "there must be other facts which, when considered with the amount of time, indicate that it would be inequitable to grant the relief requested." See Tokash v. Workmen's Compensation Commission, 346 Mo. 100, 139 S.W. 2d 978, 984[6, 7], and cases cited therein; Stephenson v. Stephenson, supra, 171 S.W.2d 568[8-11]. However, defendants do not point to a single circumstance which they say would make inequitable our approval of the instant judgment. (It is noted that neither Shive nor the Institute claim any interest whatsoever, legal or equitable, in the 60 acres which the Institute conveyed by warranty deed in consideration of $200 cash and the $1,300 second deed of trust, upon which they will receive "a few dollars" as a result of the foreclosure of the $1,500 first deed of trust.) As to Shive, we have shown that the equities are clearly with plaintiff, not Shive. And as to the Institute, under Shive's own testimony, he was the Institute and anything salvaged by the Institute was to go to him.
The judgment is affirmed.
VAN OSDOL and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.
All concur.