George R. McFARLAND et al.,
Respondents,

v.

Lewis A. BRADDY and Donna Braddy,
his wife, Appellants.

No. 38085.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Nov. 8, 1977.

Motion for Rehearing and/or Transfer
Denied Dec. 16, 1977.

Application to Transfer Denied
Feb. 8, 1978.

Tyree C. Derrick, St. Louis, for appellants.

Roberts & Roberts, V. Kenneth Rohrer, Farmington, for respondents.

NORWIN D. HOUSER, Special Judge.

Action in ejectment and for damages, rents and profits (Count I) and to quiet title (Count II) to a tract of land in St. Francois County, and to annul two deeds to the land and expunge the deeds from the land records (Count III). Defendants filed a Counterclaim in three counts, (I) to quiet title in defendants based on implied trust, tenancy by the entireties, and a warranty deed from the survivor; (2) alternatively, to quiet title in defendants on the basis of adverse possession, and (3) alternatively to recover for improvements made on the land. Without the aid of a jury the circuit court heard all phases of the case except the issues of damages, rents and profits. The court found the issues for plaintiffs and against defendants on Counts I, II and III of the petition, except for the issues of damages, rents and profits, which were submitted to a jury. The court found the issues for plaintiffs and against defendants on all three counts of the counterclaim. The jury returned a verdict for plaintiffs and against defendants for $1.00 damages and $67.50 monthly rents and profits until possession was restored to plaintiffs. Defendants appealed from the ensuing judgment.

Plaintiffs assert title through their grandfather, Ed Curlee, who they claim was vested with fee simple title absolute in 1935. Ed Curlee died intestate in 1955. Plaintiffs contend that from Ed Curlee, plaintiffs' mother Mary McFarland (Ed and Emma Curlee's only child) inherited the land subject to Emma's dower right (never assigned), her right of quarantine (which they say expired 10 years after Ed Curlee's death), and her homestead right (which they say terminated upon the death of Emma Curlee March 1, 1974); that plaintiffs inherited the land from their mother, Mary McFarland (who died intestate in 1958), subject to the rights of their father Delbert McFarland, which terminated upon the execution by him of a quitclaim deed to plaintiffs.

Defendant Lewis A. Braddy (son of Emma by a former marriage; never adopted by Ed Curlee), claims title by deed dated February 7, 1967 from Emma Curlee to him. He traces his title back to Otto Behrbaum, who by way of gift deeded one portion and willed another portion of this land to Ed Curlee and Emma Curlee, subject to underground rights in 80 acres Behrbaum devised to Walter Meltzer, and an $800 mortgage held by St. Francois County School Fund. Lewis claims that in 1935 the county demanded payment of the $800 mortgage from the Curlees who, act-

ing on advice of counsel, allowed the mortgage to be foreclosed and the land sold at public sale; that Ed Curlee purchased the land at the sale for $1,200; that three days after the foreclosure sale Ed and Emma Curlee signed a bond and deed of trust on the land to the school fund for $1,200—money used to pay the amount Ed Curlee bid at the sale; that the foreclosure wiped out Meltzer's interest and the $800 lien; that both Ed and Emma intended to have the sheriff's deed name both of them as grantees, as tenants by the entireties, but by mischance the sheriff's deed, dated May 6, 1935, named Ed Curlee alone as grantee instead of both of them; that when Emma pointed out to Ed that he was named as sole grantee he acknowledged the error and promised to have the deed corrected to include Emma's name as a grantee with Ed, but that he failed to do so; that when Ed bought the land at the sheriff's sale and took title in his name he thereupon and at that time took title in trust for Emma and in equity held title with her as tenants by the entireties on the basis of a constructive trust [1]; that Ed Curlee paid the $1,200 bond partly from funds supplied by Emma, and the deed of trust was cancelled; that upon Ed's death January 15, 1955 Emma as survivor succeeded to the entire title, giving her good right to convey to Lewis on February 7, 1967.

The appellate court will sustain the decree on issues tried to the court "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

Appellants, contending there is no substantial evidence to support the decree; that it is against the weight of the evidence and that the court erroneously applied the law, make two points: that the court erred (1) in failing to decree that a constructive trust arose at the moment Ed Curlee bought the land at the foreclosure sale with his and his wife's money and took title in his name alone, and (2) that the court erred in holding that the deed from Emma to Lewis Braddy was the result of a scrivener's mistake and was not intended to be executed or delivered.

Applying the tests of *Murphy v. Carron*, the first critically important question is whether some of Emma's money went into the purchase of the land at the foreclosure sale, pursuant to an intention on the part of Ed and Emma that title be taken in their joint names as tenants by the entireties, or whether the sheriff's deed was intended to be a conveyance of the title to Ed Curlee only. If that question is decided favorably to defendants the next vital question is whether the warranty deed from Emma to Lewis dated February 7, 1967, purporting to convey the whole farm, was a good and valid conveyance of the fee simple title.

## ON THE QUESTION OF SOLE OWNERSHIP OR TENANCY BY THE ENTIRETIES

Unchallenged documentary evidence shows that the sheriff's deed named Ed Curlee as the sole grantee; that Ed Curlee and Emma Curlee, his wife, signed the $1,200 bond as principals and that they both signed the deed of trust of May 7, 1935 by which they bound themselves to pay that sum, referred to in the documents as money

1. Appellants cite cases both on the theory of constructive trust, *Coffey v. Coffey*, 485 S.W.2d 167 (Mo.App.1972); *Schneider v. Schneider*, 347 Mo. 102, 146 S.W.2d 584 (Mo. 1940); *Schroer v. Schroer*, 248 S.W.2d 617 (Mo.1952); *Feltz v. Pavlik*, 257 S.W.2d 214 (Mo.App.1953); *McHenry v. Brown*, 388 S.W.2d 797 (Mo.1965); *Happel v. Grogan*, 514 S.W.2d 178 (Mo.App.1974); *March v. Gerstenschlager*, 436 S.W.2d 6 (Mo.1969); *Swon v. Huddleston*, 282 S.W.2d 18 (Mo.1955); *Collins v. Shive*, 261 S.W.2d 58 (Mo.1953), and resulting trust, *Keefe v. Keefe*, 435 S.W.2d 313 (Mo. 1968); *Frost v. Frost*, 200 Mo. 474, 98 S.W. 527 (Mo.1906); *Davis v. Roberts*, 365 Mo. 1195, 295 S.W.2d 152 (Mo. banc 1956); *James v. James*, 248 S.W.2d 623 (Mo.1952); *Meyer v. Meyer*, 285 S.W.2d 694 (Mo.1956); *Clay v. Walker*, 6 S.W.2d 961 (Mo.App.1928); *Pizzo v. Pizzo*, 365 Mo. 1224, 295 S.W.2d 377 (Mo. banc 1956); *Jankowski v. Delfert*, 356 Mo. 184, 201 S.W.2d 331 (Mo.1947), in support of their position that the facts give rise to an implied trust.

borrowed from the school fund, and that the $1,200 bond was repaid to the school fund as follows:

| Date | Principal | Interest |
|------|-----------|----------|
| 12–10–1941 | $600.00 | $60.60 |
| 12– 4–1942 | 400.00 | 36.00 |
| 2–10–1943 | 200.00 | 2.00 |

Receipts signed by the county treasurer were issued in each instance to "Ed. Curlee." The proximity of the dates of the foreclosure (May 4), the sheriff's deed (May 6), and the deed of trust (May 7), together with a consideration of the amount borrowed ($1,200) in comparison with the amount required to satisfy the $800 debt, with interest to March 29, 1935 ($1,007.47), plus interest from March 29 to May 4, 1935, plus publication costs, etc., totalling approximately $1,200, constitutes circumstantial evidence that the $1,200 borrowed as aforesaid was used to discharge the debt and costs.

Defendant Lewis A. Braddy supplemented this evidence by giving oral testimony as follows: Ed and Emma went to I. N. Threlkeld, an attorney, to get advice about the threatened foreclosure of the farm. Acting as spokesman, Emma told the lawyer that "she" wanted to borrow the money. The lawyer advised her to "let it go through foreclosure and reborrow the money to pay that off. * * * You can buy it in." Attorney Threlkeld offered to arrange for the loan, sign the note as a surety and get Joe Diemer to sign as an additional surety. The lawyer advised Ed and Emma that, since Walter Meltzer's interest in the 80 acres was subject to the school fund mortgage, Ed and Emma could "cut his interest out and have it auctioned and buy in the whole thing . . . in both of your names." Accepting his advice, Ed and Emma said "that was suitable." Emma came home and told Lewis that "Everything is fixed . . . taken care of"; that the attorney would get the money for them, and said "We are going to buy the place in, buy the farm in." After the sale Emma told Lewis that they made the deal; that everything was "all in order"; that "they" borrowed the money for the purpose

of buying in the farm; that "they" paid the borrowed money to the sheriff "to get the property back in their name." The sheriff's deed was sent by mail. Emma looked at it. Ed could not read. She said, "Why, Ed, the sheriff had made a mistake here," pointing out that only his name appeared on the deed, "You better take that back over there [to Farmington, the county seat] and have it fixed over, have them do it over." Ed said, "I will do it in a few days." The question arose several different times. Emma would ask Ed when he was going to take the deed to Farmington. One day in 1935 Ed Curlee had a conversation with Omer Barton in which Ed told Barton "about just his name being on the face of the deed" and that it happened because the "Sheriff made a mistake." Twice in after years Emma, referring to the correction of the deed to show that the conveyance was to both of them, told Lewis that "Everything has been taken care of." Lewis testified that his grandfather moved from the southeast part of the state, set up a sawmill, and told Emma that " * * * all of my spare money that I get, I will give you to make payments on this mortgage." He claimed that Emma and her father " * * * saved their money. They pooled their money together, and any time he sold any lumber or anything like that, why, he would give it to Mother to make the payments on the mortgage." Inconsistently, Lewis later testified that he really did not know where the money came from to make the payments to satisfy the debt due the school fund.

Esther Hoehl, a cousin of Lewis, testified that in two or three conversations over a period of two years she heard Ed Curlee tell her father that he got the money to buy the land at the sheriff's sale from a school loan and that "he was going to have the sheriff put the deed in both their names . . . it was supposed to be put in both their names and the sheriff was supposed to do it . . . he [Ed Curlee] was having it put in both their names."

Omer Barton testified that he heard Ed Curlee talking to Bill Huls, and that Ed

said, "They tell me my deed is wrong or something . . . . I don't think it's got my wife's name on it. Her name is supposed to be on it." Ed showed Bill the deed. Bill looked at it and said, "Your wife's name is not on there . . . you better do something about it." Ed Curlee said, "I guess I will have to."

On the issue whether Emma's money was used to pay the school fund mortgage and whether it was the intention of the parties that the sheriff's deed name as grantees both Ed and Emma as tenants by the entireties, the circuit court made the following findings of fact:

"2. (h) That the tract of real estate at issue was deeded to Ed Curlee, only, on May 6, 1935, * * * and that except for a utility easement and a small strip of land to the Missouri Highway Department, title to the tract remained solely his until his death in fee simple absolute. * * *

"(w) That at no time, either before or after 1935, did Ed Curlee promise, by word, conduct or otherwise, to create, vest, convey or give any right, title or interest to Emma Curlee in the tract of real estate in question.

"(x) That there is no creditable evidence the purchase price for the property was paid by Emma Curlee or from funds in which Emma Curlee had any interest and that the receipts for such purchase price are to Ed Curlee only."

The circuit court made the following conclusions of law on this question:

"3. * * * That title to the property was vested in Ed Curlee in fee simple absolute prior to his death on January 15, 1955. Upon the death of Ed Curlee, Emma Curlee acquired the right of quarantine and the right to homestead in the property as his surviving widow. That dower was never assigned * * * that Emma Curlee acquired and could convey no title in said real estate other than her possessory interest of quarantine and homestead and that Emma Curlee acquired no interest in said property by either adverse possession or as a consequence of a resulting or constructive trust. * * * "

To establish an implied trust an extraordinary degree of proof is required. The evidence must be so clear, cogent, unequivocal and positive as to banish doubts from the mind of the chancellor—to exclude every reasonable doubt in his mind. A preponderance of the evidence is insufficient. The evidence must be so unquestionable in its character, so convincing that no reasonable doubt can be entertained of its truth. *March v. Gerstenschlager*, 436 S.W.2d 6, 8[1] (Mo.1969).

The documentary evidence establishes beyond question that both Ed Curlee and Emma Curlee signed the bond for $1,200 to raise the money to pay for the land purchased by Ed at the foreclosure sale, and that both of them executed the deed of trust securing the bond. The proceeds of the loan belonged to the borrowers (Ed and Emma Curlee). Emma had an interest in the money. When it was paid to the sheriff in satisfaction of Ed's bid at the foreclosure sale some of Emma's money went into the purchase. That leaves the question whether it was paid pursuant to an intention on the part of Ed and Emma that title be taken in their joint names as husband and wife, so as to create a tenancy by the entireties. While the documentary evidence does not establish this fact it does corroborate the oral testimony of Lewis in one important particular, namely, that I. N. Threlkeld and Joseph Diemer signed the $1,200 bond as sureties. This bit of documentary corroboration lends credence to Lewis' testimony relating I. N. Threlkeld's connection with the matter and leads us to accept that portion of Lewis' testimony indicating that the parties intended that title be taken in the names of both Ed Curlee and Emma Curlee. Ed and Emma, husband and wife, originally took title as tenants by the entireties by virtue of Behrbaum's devise to both of them. As such Emma had an undivided interest in the land. When foreclosure was threatened they sought legal advice. To cut out an outstanding cloud on their title they were advised to let the foreclosure proceed, buy the property at the

foreclosure sale, and take title *in both their names*, thus continuing to hold the land in the same way they took by will, that is, to preserve Emma's interest in the land by Ed and Emma holding the title together as husband and wife. This met with their joint approval. There is no evidence that Ed demurred or suggested that title be taken in his name alone. He willingly went along with the proposed procedure. There is no evidence of any intention to deprive Emma of her interest in the land. The parties undertook to follow their lawyer's advice. All went according to plan until the sheriff's deed was prepared. Either by design, direction, mischance or oversight Ed Curlee was named as sole grantee and Emma Curlee's name was omitted from the granting clause. As a result Emma was deprived of her rightful title as tenant by the entireties, a benefit she should have had and otherwise would have had. Findings of fact 2(w) and 2(x) are against the weight of the evidence. The conclusion of law that Emma acquired no interest in the property as a consequence of a constructive trust is an erroneous declaration.

■ In some cases fraud, actual or constructive, is said to be the foundation of constructive trusts. Other cases proceed upon the theory of unjust enrichment or of an unfair or wrongful withholding, without the element of fraudulent intent. If a fiduciary or confidential relationship exists between the alleged trustee and the beneficiary, proof of fraud is not required to establish a constructive trust. These principles are enunciated in *Swon v. Huddleston*, 282 S.W.2d 18, 25[7, 8] (Mo.1955), and in the cases there cited. And see *March v. Gerstenschlager*, 436 S.W.2d 6, 8[2] (Mo.1969). There is no suggestion of actual fraud on the part of Ed Curlee (a man unlettered and unable to read or write anything other than his name), but the foregoing facts demonstrate the existence of the closest kind of confidential relationship, and a breach of that relationship, and a classic case of unjust enrichment. Sitting as a court of equity we employ the machinery of a trust to provide a remedy for the wrong done Emma by declaring that upon the execution of the sheriff's deed Ed Curlee became trustee for her in the land to which she in good conscience was entitled to a present interest, by impressing a constructive trust on the property in her favor, and declaring that Ed and Emma Curlee, husband and wife, held the title as tenants by the entireties.

■ Plaintiffs-respondents assert that "defendants' claim of an implied trust is barred by the pleaded defenses of statute of limitations and laches." This contention "may also be disposed of by the simple suggestion that the sole purpose of the statute of limitations, by its very language, is to bar actions, and not to suppress or deny matters of defense, whether equitable or legal; and that, too, when, as in this case, the equitable defense is accompanied by a prayer for affirmative relief. The purpose of the statute is to quiet the assertion of old, stale, and antiquated demands, but it has never been thought that its intended object was to go further, and to deny a just and meritorious defense, whether the facts of that defense had their birth in the first, tenth, or twentieth year before the call for the assertion of those facts was made necessary by some hostile claim, demand, or proceeding. A ground of defense never becomes stale or barred by the statute of limitations, but grows in strength and force as the limitation period against a right of action widens. The statute of limitations may be used by a defendant as a shield for his protection or defense, but is never to be turned upon him as a sword with which to compass his defeat." *Butler v. Carpenter*, 163 Mo. 597, 63 S.W. 823, 824–825 (1901). And see *Williamson v. Brown*, 195 Mo. 313, 93 S.W. 791, 795 (1906); *Hubbard v. Slavens*, 218 Mo. 598, 117 S.W. 1104, 1112 (1909); *State ex rel. Missouri State Highway Commission v. Fitton*, 180 S.W.2d 245, 248[2] (Mo.App.1944).

## ON THE QUESTION OF THE VALIDITY OF THE DEEDS DATED FEBRUARY 7, 1967

It is conceded that two deeds from Emma Curlee to Lewis A. Braddy, both dated Feb-

ruary 7, 1967 were placed of record on the land records of St. Francois County. One of them, purporting to convey 4½ acres out of the S.W. ¼ of the N.E. ¼ of Sec. 25, Twp. 36, N.Rg. 4 E., was filed for record on March 7, 1967, one month after date of execution. The other, purporting to convey the whole farm, including all of the S.W. ¼ of the N.E. ¼ aforesaid, was filed for record on March 11, 1974, seven years after date of execution and eleven days after the death of Emma Curlee.

On this issue Lewis testified as follows: The deed to the 4½ acres was made after several months of discussion between him and his mother, beginning the previous spring, resulting in an agreement that Lewis pay his mother $800. The deed to the whole farm was handed to Lewis in the office of the notary public, to which Emma had been taken "in the car" by Lewis' wife. Lewis was called to the notary's office by telephone and handed the deed without any prior knowledge on his part that his mother intended to make this deed. On direct examination Lewis testified that Emma's reason for deeding the whole farm to him was that she was going to apply for welfare payments; that she "wanted to get on welfare," but she did not want any deed to show up on the public records which might affect her (eligibility to receive) welfare; that Lewis did not record the deed at the time because Emma told him not to record it until after her death. On rebuttal Lewis gave a different reason: that when Emma gave him the deed she said, "This is to repay you from the past." The suggestion that the deed being on record might affect Emma's application for welfare (an application to be made at a future time) is baffling in view of Plaintiffs' Exhibit 10, which is a copy of Emma's old age assistance application, dated June 18, 1957, almost ten years *prior* to the deed of February 7, 1967.

Omer Barton, the notary public who acknowledged the two deeds dated February 7, 1967, testified as follows: Emma came to him, desiring to make the place over to her son because she wanted to get on relief, and could not do it if she owned the farm. Barton drew the deed, using an abstract of title furnished by Emma, from which he obtained the legal description. When first questioned on cross-examination witness Barton did not recall having acknowledged the other deed (for 4½ acres), which the record shows to have been executed by Emma and acknowledged by Barton that same day. When the deed for 4½ acres was presented to him on the witness stand Barton recognized his signature and acknowledged the genuineness of the deed. He testified that he notarized both deeds on February 7, 1967; that the only way he could have made the deed to the 4½ acres would have been for Emma to have brought him the legal description of the 4½-acre tract. Inconsistently, he later testified that he did not know where that description came from. He did not know or remember the purpose of having two deeds to the same person made the same day covering the same property, one for the 4½ acres, the other for the whole farm. He testified that it could have been possible that a mistake was made on one and that the other was made to straighten out the mistake, and cover only the 4½ acres. After an overnight adjournment, and on redirect examination, referring to his previous testimony that a mistake could have accounted for the two deeds, Barton testified that he was referring to a mistake *as to the acreages* —that he had not been referring to the possibility of a substitution of one deed for another by mistake. When pressed on re-cross-examination to say whether he made the second deed because of a mistake in the description in the first deed, Barton stated that he did not have a clear recollection of the two deeds or why there were two deeds instead of one; did not know which of the two deeds was written first; did not know whether one deed was made to correct the other.

From the time of the foreclosure sale in 1935 until his death in 1955, Ed and Emma lived on this farm. In March, 1955, following Ed's death in January, 1955, Emma and her daughter Mary joined in a warranty deed conveying 2.25 acres of the farm to Homer Craig and wife. In June, 1956

Emma, and her daughter Mary and Mary's husband executed a one-year option contract to St. Joseph Lead Company (never exercised). In July, 1959 Emma, joined by Lewis and wife and Mary's heirs, executed a warranty deed to Kelly LaBreyere conveying surface rights to two acres of the farm. In March, 1961 Emma executed a 5-year lease of the farm to Lewis. In September, 1967 Emma executed another 5-year lease of the whole farm to Lewis, notwithstanding according to Lewis he was already the fee simple owner of the farm. In November, 1972 Emma granted Robert Peters a road easement across the south side of the farm.

Throughout this period and until her death March 1, 1974 Emma continued to live on the land, treating the farm as her own; making statements to "everybody she knew practically, it was hers"; that "This is my farm"; saying to all her friends, "I am the boss of the farm," claiming she owned the farm, and "always [telling] everybody it was her farm."

Henry Buff testified that on three separate occasions, in the fall of 1967, in 1969 and again in 1973, Emma told him that Lewis had threatened her; threatened to call the sheriff and have her thrown "off her own ground"; that Lewis "don't own a foot of ground up there, not even the ground that his trailer sits on."

Brenda LaPlant testified that on one occasion in 1967 she encountered Emma, who was crying and upset; that Emma told her that Lewis had threatened her and was going to try to kick her off her land; that she owned the land, and he owned nothing; that at Thanksgiving Time in 1969 Emma made the statement that she had already given Lewis his part, referring by name to "the Leonard part" (not a part of the land in suit), and that when she died her remaining property would go to her three grandchildren. She repeated this statement in January, 1974.

W. Sidney Ruddy testified that "around 1970" Lewis showed him the deed to the farm; that one day, while Ruddy was taking Emma to the doctor, Emma mentioned the disposal of her property in the future. Ruddy mentioned the deed from Emma to Lewis and stated that he had read it. Emma responded that "there was no such deed," and if there was such a deed she had signed "that she was led to believe in the office of Omer Barton that it was for a small piece of ground across the highway from her home." This conversation occurred six months to a year before Emma died.

On the issue of the validity of the deed to the whole farm the circuit court made the following findings of fact:

"2(cc) That the deed from Emma Curlee to Adrian Braddy dated February 7, 1967 and recorded at book 597 page 364 was made as the result of a scrivener mistake and was not intended to be executed or delivered to Defendant and Emma Curlee was not aware of such deed."

The court made the following conclusions of law with respect to the validity of the deeds:

"That the deed dated February 7, 1967, and recorded March 11, 1974, is void and a nullity and that the deed of the same date recorded March 7, 1967 conveyed only a life interest for the life of Emma Curlee to Defendants and that such interest expired March 1, 1974."

The circuit court made no findings of fact with reference to the deed to the 4½ acres dated February 7, 1967, recorded in Book 468, page 261, of the Land Records of St. Francois County, but simply declared it void and a nullity. Appellants, however, did not perfect their appeal from this provision of the judgment by briefing any point with reference to the judgment annulling that deed, and therefore that part of the judgment voiding the deed to the 4½ acre tract will stand.

■ There is substantial evidence in support of the court's finding of fact 2(cc), that the deed to the whole farm, dated February 7, 1967, was made as a result of a scrivener mistake; that it was not intended to be executed or delivered to Lewis and that Emma was not aware of the deed.

It is a reasonable inference from testimony which this Court accepts that Emma went to see Omer Barton, the notary, on February 7, 1967 to have a deed prepared to convey the 4½-acre tract to her son Lewis pursuant to an agreement that she would sell it to him for $800; that she presented the notary with an abstract of title, from which he obtained a description of the whole farm; that he mistakenly inserted that description in the deed; that the mistake was realized and to correct the mistake the notary on the same day prepared a second deed containing the proper legal description of the 4½-acre tract, which description was furnished to the notary by Emma; that the first deed (to the whole farm) was not delivered to Lewis, and by oversight or misadventure was not destroyed; that Lewis (who had access to his mother's strongbox) came into the possession of the latter deed, and held it until after his mother's death before filing it for record; that when Emma signed the first deed to the whole farm she mistakenly thought she was signing a deed to the 4½-acre tract, and in later years did not know that the first deed was outstanding in the hands of Lewis.

The following facts, which arouse strong suspicions about the genuineness of the purported deed to the whole farm, support this conclusion:

(1) that two deeds, both of which included the 4½-acre tract, purportedly were executed to the same person on the same date;

(2) that the deed to the 4½-acre tract was promptly recorded, but the deed to the whole farm was withheld from public record for 7 years after date of execution, throughout the balance of the lifetime of the grantor, and not recorded until after her death, she being the only other person in the world who knew and could testify whether she had intended to convey the whole farm to her son;

(3) that Lewis gave conflicting testimony to account for his mother deeding the farm to him;

(4) that on September 20, 1967 Emma signed a lease of the farm to Lewis, who signed as lessee notwithstanding his claim that he was at that time the fee simple owner;

(5) that Emma was not apprised of the existence of an outstanding deed of the whole farm to her son. This is evidenced by the conceded fact that at all times after Ed's death and up until the time of her death Emma claimed she was owner of the farm; lived on the land and exercised the ordinary incidents of ownership, such as leasing it, selling off small parcels of the land, granting easements, options, etc. and made statements that Lewis had no interest in the farm; that when the existence of the deed was suggested to her she denied its existence, stating that if she signed it she had been misled into believing she was signing a document relating to a small piece of land "across the highway"; that she declared that Lewis had been taken care of by a previous conveyance of a 40-acre tract, and said what she had left would go to her grandchildren.

Lewis' excuse for not promptly recording the deed raises grave doubts, for, if we accept his testimony, he and his mother conspired to defraud the government by concealing Emma's ownership of the farm in order to make her eligible for welfare benefits to which she might not otherwise have been entitled, yet the record plainly shows that her application for old age assistance was made some ten years before the execution of the deed of February 7, 1967.

We conclude that Ed and Emma held title to the land conveyed by the sheriff's deed as tenants by the entireties. Upon Ed's death Emma, as survivor, succeeded to the entire fee simple title. The warranty deed from Emma to Lewis, dated February 7, 1967, recorded at Book 597, Page 364 of the Land Records of St. Francois County, is null and void and of no force and effect, and is to be expunged from the land records.

Emma died testate March 1, 1974, leaving as her heirs at law George R. McFarland, Donald R. McFarland and Mary Belle

McFarland, children of Mary McFarland, deceased, only child of Ed and Emma, and Lewis A. Braddy, son of Emma by a previous marriage. Emma's last will and testament, dated August 19, 1959, admitted to probate and in the course of administration at trial time, devised and bequeathed one-half of her property, real, personal and mixed, to the above-named children of Mary McFarland, deceased, share and share alike, and devised and bequeathed the remainder of her property, real, personal and mixed, to her son Lewis.

The judgment of April 17, 1976 is reversed and the cause is remanded with directions to enter a new judgment, as of April 17, 1976, as follows:

### On Count I of the Petition

█ The judgment finding for plaintiffs, giving them the right to immediate possession of the whole farm to the exclusion of the defendants, is reversed, and on remand judgment shall be entered for defendants on Count I, both on the question of right to exclusive possession, and on the issues of damages and rents and profits. Under § 442.450, RSMO 1969 [2] the devisees became tenants in common, each entitled to the use and possession of the common property. *Mack v. Mack*, 286 S.W.2d 385 (Mo.App. 1956). "One tenant in common who occupies all or more than his proportionate share of the common premises is not liable to his cotenant because of such occupation, alone, for rent, or for the use and occupation of the same, * * * unless his cotenant has ousted him, or has been guilty of acts amounting to a total denial of his rights as such cotenant. * * *" *Metzger v. Metzger*, 153 S.W.2d 118, 122–123 (Mo.App.1941). There is no evidence in this record of such ouster or acts on Lewis' part. Unlawful withholding of possession and loss of rents and profits are alleged in Count I of the Petition but the record of the trial on the issue of damages, rents and profits before the jury has not been preserved and presented to us on this appeal, and therefore there is no evidential basis upon which we can make a determination on the question of ouster vel non.

### On Count II of the Petition

The judgment on Count II, quieting title in plaintiffs, is reversed, and on remand judgment shall be entered quieting title in plaintiffs McFarland to an undivided one-half interest as tenants in common, share and share alike, and an undivided one-half interest in Lewis A. Braddy, as tenant in common.

### On Count III of the Petition

The judgment on Count III, declaring the deeds dated February 7, 1967 null and void, and ordering their expungement from the land records, is affirmed.

### On Count I of the Counterclaim

The judgment finding against defendants on their claim of a constructive trust and title in Emma as survivor of a tenancy by the entireties is reversed.

### On Count II of the Counterclaim

The judgment finding against defendants on their claim of title by adverse possession is affirmed.

### On Count III of the Counterclaim

The judgment finding against defendants on their claim for improvements on the land is affirmed.

The costs are assessed equally against appellants and respondents.

SIMEONE, C. J., and ALDEN A. STOCKARD, Special Judge, concur.

---

2. "442.450. Conveyance to more than one—effect. Every interest in real estate granted or devised to two or more persons, other than executors and trustees and husband and wife, shall be a tenancy in common, unless expressly declared, in such grant or devise, to be in joint tenancy."