The **SERVICE LIFE INSURANCE COMPANY OF FORT WORTH, Texas, Plaintiff,**

v.

Julia Ann **DAVIS, Administratrix of the Estate of Randall E. Ferguson, Deceased, Defendant, Crossclaimant-Appellant,**

**Cheryl Downing Baublit, Defendant, Crossclaimant-Respondent.**

No. 25416.

Kansas City Court of Appeals, Missouri.

April 5, 1971.

Vernon N. Kneib, St. Joseph, for appellant.

J. W. Roberts, Strop, Watkins, Roberts & Hale, St. Joseph, for respondent.

SHANGLER, Presiding Judge.

This interpleader action involves a sum of $11,540, proceeds from a life insurance policy issued by plaintiff Service Life Insurance Company of Fort Worth, Texas, to Randall E. Ferguson who died as the result of accident while on active duty with the United States Marine Corps in Viet Nam. Randall died intestate and Julia Davis, his mother, was appointed administratrix. The insurer joined as defendants Cheryl Downing (now Baublit) the named beneficiary in the policy and Julia Ann Davis, administratrix, each of whom cross-claimed for the recovery of the fund. Plaintiff insurer paid the proceeds into the registry of the court, was allowed its costs, and was ordered discharged.

· The trial court found that Cheryl Downing Baublit was entitled to the fund as the named beneficiary in the policy and gave judgment upon her cross-claim. The administratrix, Julia Ann Davis, appeals contending that in the circumstances, and for the reasons we later detail, equity and good conscience require that Cheryl hold such proceeds as trustee of a constructive trust for the benefit of Randall Ferguson's heirs at law.

Cheryl Downing and Randall Ferguson met for the first time while attending DeKalb High School in Rushville, Missouri. She was then thirteen years of age, he was sixteen. Randall visited her frequently thereafter in the Downing home, but always under parental chaperonage. It was not until the Spring of 1964, when Randall and Cheryl attended a high school dance, that they had their first unescorted date. She was then sixteen, he eighteen. In all they had five dates before Randall left for the Marine Corps upon his graduation from high school in May of 1964. During that period they also met covertly, but not alone, in the home of Virginia Dyer who was Cheryl's classmate and a friend of long standing. Cheryl knew that her parents thought her too young for a serious attachment to any boy and for that reason objected to her relationship with Randall. Notwithstanding, Cheryl and Randall exchanged endearments and avowals of love and came to an understanding they would marry "some day".

Cheryl, however, did not consider herself engaged to Randall. She had neither been offered nor accepted a ring from him. Also, although they spoke of marriage, both realized that she had yet to complete two years of high school, and he three years of military service, before marriage was possible. They had agreed that during his absence each was free to date others. In fact, Randall was aware that Cheryl was dating local boys, including Brian Keefhauver (whose ring she wore for a while), and acquiesced in that knowledge. It was understood, however, that neither of them was to form a serious liaison with anyone else.

During Randall's absence, they wrote each other every day. While in the United

States, he telephoned her regularly. Then, when Randall returned on a twenty-one day leave in September, 1964, they saw each other daily. Throughout, they continued to profess love for each other and spoke of a future marriage. Their relationship was such that they believed and trusted one another. On New Year's Day of 1965, Randall telephoned Cheryl from California. He was soon to embark for Okinawa and then Viet Nam. He told her that he was designating her the beneficiary of his life insurance policy because he had no one else. She asked him not to. Notwithstanding, on March 2, 1965, Randall made application to plaintiff Service Life Insurance Company for a life policy and arranged for the payment of premiums by a monthly allotment deduction of $8.50. On May 1, 1965, the policy issued designating "Cheryl Downing—Fiancee" the beneficiary. The policy, as indicated by the insurer's undated letter of transmittal, was sent to Cheryl for keeping at Randall's direction. When Cheryl received the policy and letter on May 13th or 14th, 1965, she showed it to her mother. Mrs. Downing promptly told her: "Write and tell him to take your name off that policy because it will cause a big wrangle with the family". Cheryl immediately complied. To this Randall responded about the first of June, 1965 that he had "dropped the policy", his Uncle Bud had a better one for him. Then, on June 16, 1965, Randall wrote his mother, cross-claimant Julia Davis, that he planned to discontinue the policy because he really could not afford it. Less than a month before his death, on July 7, 1965, he wrote his aunt, Betty Crockett, that he had dropped the policy. From the time the policy issued until after Randall's death, Cheryl had not removed it from her dresser drawer in which she had placed it. She and Randall did not discuss its terms in any of their letters nor did Randall ever write Cheryl requesting that it be sent to him or anyone else.

When Cheryl met George Baublit at the end of May, 1965 (whom she married in January, 1967 and who, at trial, was himself serving in Viet Nam) her feelings for Randall began to change. In early July, 1965, Cheryl wrote Randall (described by him and referred to throughout as the "Dear John" letter) that because she had met George, their former relationship looking to future marriage could not continue. She wished, however, to continue corresponding since she remained fond of him. Corporal Carl Riddle, who served with Randall in Viet Nam, had been told of the letter by Randall and thought it saddened and depressed him for a while. Before long, they resumed writing as before and the only two letters Cheryl did not destroy, the last written on the day before his death, were congenial and cheerful.

Only because appellant makes much of it, we mention that Cheryl inscribed this legend in the 1965 issue of the high school yearbook owned by Susie Davis, Randall's sister:

"Well, to me it has been a long, lonely year, you know why! I'm sure glad you were here to let me talk to you about Fergie, Suzi. I hope we will end up sister-in-laws, but things do change and so does Randy!"

Asked what she meant by it, Cheryl explained: "I meant at the time I was sixteen and Randy was eighteen, and you think a lot different then than when you grow older, and it was two years I had to wait".

On August 2, 1965, Randall shot himself accidentally while cleaning his weapon and died. A few days later, Susie visited Cheryl who then for the first time since it had come into her possession removed the insurance policy from the dresser drawer and showed it to Susie. Mrs. Davis, Susie's mother, called Cheryl the next day and asked that she bring her the policy, and she did. Believing the policy had been discontinued, she told Mrs. Davis it was of no value. Mrs. Davis thought nonetheless it should be determined if the policy was still in effect. If so, each thought the other should have the proceeds. At that,

Cheryl suggested they be divided among certain churches and a boys' home. Later Cheryl and her mother attempted to retrieve the policy from Mrs. Davis, who, although she had it, told them it had been given to her attorney. By now, Cheryl had decided that Randall had intended for her to have the proceeds and, therefore, she meant to have them.

Cheryl attended the funeral ceremony with the Fergusons and signed the family funeral register: "Cheryl Downing, engaged". It was inscribed in that manner not only at the behest of Susie and other relatives of the deceased, but also because on that occasion she "felt closer to (Randall)".

These are the facts expressly found by the trial chancellor, as well as those implicitly inferable from those given, to support his judgment in favor of Cheryl Downing Baublit as beneficiary under the policy. Cheryl alone gave evidence in support of her crossclaim while Julia Davis was the principal witness for the estate.

In her brief, as she had throughout the trial and in her after-trial motion, appellant continues to impugn Cheryl's credibility and charges the trial court with error in having expressly found her testimony that of "a very forthright witness", and therefore credible. Much of the competing testimony of Cheryl and Mrs. Davis—from which, largely, appellant's claim to a constructive trust must find support, if at all—was in direct conflict. During the trial, appellant undertook to discredit Cheryl by her previous deposition testimony, portions of which were also received as admissions against her interest. The court expressly found that her deposition testimony was "very similar to her testimony in court". It is not necessary to reiterate all the instances of testimonial deceit appellant attributes to Cheryl to conclude that credibility was a determinative factor in the court's adjudication of all the ultimate issues. Certainly, as to appellant's alternative theory of recovery, that of a constructive trust ex maleficio, where the central issue to be determined by the trier of fact was

Cheryl's actual state of mind during her relationship with Randall and what he could reasonably have understood it to be, since Randall was dead, and most of the letters between them had been destroyed or lost, the determination of that issue depended almost wholly on Cheryl's credibility. It thus became the chancellor's right and duty to determine not only her credibility but that of Julia Davis and the other witnesses. Warford v. Smoot, Mo., 361 Mo. 879, 237 S.W.2d 184, 188 [7]. And although we review the law and the evidence de novo (Civil Rule 73.01(d), V.A.M.R.), where the evidence upon all the vital questions involved is substantially oral, we will defer to the views of the trial judge who had the witnesses before him and defer as well to him in the matter of credibility, particularly where the oral testimony is conflicting. Norton v. Norton, Mo., 43 S.W.2d 1024, 1033 [11]. Having done so, we adopt the chancellor's findings of fact, his conclusions of law, and affirm the judgment.

■ Except when otherwise prohibited by statute—a limitation not applicable here—" '(t)here can be no doubt that every person has an insurable interest in his own life and that he may insure it for the benefit of any person whom he sees fit to name as beneficiary' ". Walker v. General American Life Ins. Co., Mo., 141 S.W.2d 785, 787 [4]; Lakin v. Postal Life & Casualty Ins. Co., Mo., 316 S.W.2d 542, 552 [9, 10]. The death benefits under the policy were made payable to "Cheryl Downing—fiancee". Thus, the beneficiary was specifically named and definitely identified. It is not questioned that Cheryl Downing and Cheryl Downing Baublit are the same person. And while Cheryl Downing was described in the policy as the "fiancee" of the insured—even though she may never have been in that relationship with the insured—that term is to be taken as " 'mere descriptio personae' " which descriptive designation "cannot control over the specific designation of the particular individual intended to receive the proceeds of the insurance policy". Walker v. General

American Life Ins. Co., l. c. 788 [7]; Richardson v. Kuhlmyer, Mo., 250 S.W.2d 355, 361 [9]; Scherer v. Wahlstrom, (Tex.Civ.App.) 318 S.W.2d 456, 459 [7].

As the life insurance policy reserved to the insured, Randall Ferguson, the right to change beneficiary, it did not confer on Cheryl a vested right to the proceeds but only an expectancy which could have been terminated by the insured at any time. New York Life Ins. Co. v. Wright, 229 Mo.App. 950, 88 S.W.2d 403, 408 [3]; Postal Life & Casualty Ins. Co. v. Tillman, et al, Mo.App., 287 S.W.2d 121, 125 [2]. No change in beneficiary having been made, the expectancy became a vested right on the death of the insured (Smith v. Smith, Mo.App., 313 S.W.2d 753, 756 [3]), and a presumptive right to the proceeds arose in favor of the named beneficiary. Brown v. Prudential Insurance Co. of America, Mo.App., 375 S.W.2d 623, 630 [9].

*Julia Davis as appellant administratrix* argues, however, that equity should intervene to deny Cheryl the proceeds because by her deceit—in failing "to perform * * * in the relationship" and by retaining possession of the policy—she prevented Randall from carrying out his unequivocal intention of changing the beneficiary to *herself, as his mother*. From the tenor of appellant's argument and the authority she cites to support it (Phoenix Mutual Life Ins. Co. v. Cummings, U.S.D. C., W.D., Mo., 67 F.Supp. 159), we can only assume that appellant invokes the aid of equity not only to estop Cheryl from claiming the proceeds, but to decree to be done that which in good conscience ought to be done and award them *to herself as mother* and intended beneficiary. Julia Davis, administratrix, does not seem to sense that in asserting such a claim for herself as mother she speaks with two discordant voices. In any event, Julia Davis in any capacity other than as administratrix of the estate of the deceased Randall Ferguson is not a party to the action, is not privy to the record nor aggrieved by the judgment below, but is a stranger to the proceedings and has no standing to assert a claim for relief or have one asserted on her behalf. Sexton v. Snyder, 119 Mo. App. 668, 94 S.W. 562, 564 [1]; Ewart v. Peniston, 233 Mo. 695, 136 S.W. 422, 434 [3]; Sec. 512.020, V.A.M.S.

Appellant's salient contention is that equity ought not to allow Cheryl to retain the life insurance proceeds to which she has come by her breach of the confidential relationship with Randall, but that the fund should be impressed with a constructive trust for the benefit of Randall's heirs. Appellant argues that Randall and Cheryl were bethrothed (and thus, she says, in a relationship of mutual confidence), having come to an understanding on marriage, that Randall acted upon this expection of marriage by designating "Cheryl Downing —fiancee" beneficiary of his life insurance policy, and although she continued to write him endearingly while he was in military service, she had actually fallen in love with Baublit and so was no longer Randall's "fiancee", but she failed to notify him, thus permitting him to continue to rely on their former relationship, thereby depriving him of the opportunity to make other disposition of the proceeds by change of beneficiary. In doing so, appellant concludes, Cheryl breached the confidential relationship, and it would be inequitable, because an unjust enrichment, to permit her to retain the proceeds.

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. * * * A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." Cardozo, C. J., in Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 389, 122 N.E. 378, 380, 381; Bogert, Trusts and Trustees, Sec. 471, p. 8. A constructive trust

has also been described as a means used by equity of "effecting restitution or of rectifying a situation where, as the result of the violation of confidence or faith reposed in another, or fraudulent act or conduct of such other, the plaintiff, who seeks the aid of equity, has been wrongfully deprived of, or has lost, some title, right, equity, interest, expectancy, or benefit, in the property which, otherwise and but for such fraudulent or wrongful act or conduct, he would have had". Suhre v. Busch, 343 Mo. 679, 123 S.W.2d 8, 15 [1–3]; March v. Gerstenschlager, Mo., 436 S.W.2d 6, 8 [2]; Wier v. Kansas City, 356 Mo. 882, 204 S.W.2d 268, 270 [1]. It is a device often used by equity to restore property to one unjustly deprived of it and thus to prevent the unjust enrichment of the other. Swon v. Huddleston, Mo., 282 S.W.2d 18, 25 [7, 8]; 89 C.J.S. Trusts p. 1018. And the breach of a confidential relationship, even in the absence of actual fraud, is sufficient to give rise to a constructive trust (Trieseler v. Helmbacher, 350 Mo. 807, 168 S.W.2d 1030, 1036 [5–7]) perhaps upon the principle that such a breach is, in itself, a constructive fraud. Swon v. Huddleston, l. c. 25, 26 [9, 10]; Bogert, Trusts and Trustees, Sec. 496.

■ Appellant has virtually staked her right to equitable relief upon the violation of a subsisting confidential relationship between Randall and Cheryl which, it is contended, was a concomitant of their exchange of pledges to marry. Cheryl did not consider herself Randall's "fiancee" because her promise to marry him was conditional. Appellant, on the other hand, asserts that Cheryl's declaration of love and promise to marry were unqualified and that she understood herself to be engaged to Randall, as attested by her inscription on the funeral register. But we need not determine whether Cheryl and Randall were in actual troth-plight because in determining the existence of a confidential relationship, the origin of the confidence and the source of the influence are immaterial. Liddell v. Lee, Mo., 159 S.W.2d 769, 772 [3]; Trieseler v. Helmbacher, l. c.

1036 [8, 9]; 89 C.J.S. Trusts § 151, p. 1056. A confidential relationship is not proved merely by a showing that persons are in ties of blood or family (Beach v. Beach, Mo., 207 S.W.2d 481 [6]; Parker v. Blakeley, 338 Mo. 1189, 93 S.W.2d 981, 991 [12]; Norton v. Norton, l. c. 1032 [8, 9]) or, by the extension of analogy, of troth.

■ Although a confidential relationship cannot be exactly defined, in general application, it is synonymous with a fiduciary relationship and equity treats them alike. Equity refuses to set any bounds to the circumstances out of which a fiduciary relationship may spring. It includes not only those relationships technically fiduciary—such as attorney and client, principal and agent—but extends to instances where there is a special confidence reposed on one side and resulting domination and influence on the other. The question is always whether or not trust is reposed with respect to property or business affairs of the other. Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69, 74 [4–6]; Wilhoit v. Fite, Mo., 341 S.W.2d 806, 813 [5–6]; Liddell v. Lee, l. c. 772.

Turning to the facts of this case, it is evident that the gift Randall made to Cheryl of his life insurance proceeds was an effusion of his affection for her, a touching and considerate gesture freely made to one he dearly loved. There is no suggestion at all that it was done upon Cheryl's advice, or that she enjoyed an undue domination or influence over him in the conduct of this business. In fact, when told of his plan to name her beneficiary "because he didn't have anybody else to make it out to", she asked him not to. It is true that Cheryl acknowledged their relationship was one of trust, but the influence of that trust flowed only from natural affection and is neither a mark nor breach of that confidential relationship which we are considering. Flynn v. Union National Bank of Springfield, Mo.App., 378 S.W.2d 1, 11 [16]; New York Life Insurance Co. v. Wright, 229 Mo.App. 950, 88 S.W.2d

403, 408 [5–7]; Norton v. Norton, l. c. 1032 [8, 9].

Although direct proof is lacking, appellant's argument that Randall made Cheryl his beneficiary in contemplation of marriage is reasonable. Her designation in the policy as "fiancee" would bear that out. That is not to say that Randall's motive need have been apparent to Cheryl, particularly since the prospect of any marriage was more remote than ready. But even assuming Cheryl understood Randall's purpose in leaving her the proceeds, there is no evidence at all to support appellant's further contention that after she received the policy and then had fallen in love with Baublit, she failed to inform Randall of the change in their relationship, permitting him to persevere in the belief that her promise to marry him was still in force when it actually was not—all to the purpose that Randall would not remove her as the designated beneficiary. The evidence as found by the chancellor and adopted by us was that promptly upon receipt of the policy, Cheryl wrote Randall asking him to remove her as beneficiary. About the first of June, 1965, Randall replied that he had "dropped the policy" and obviously thought he had, for he wrote his aunt Betty Crockett to the same effect. From that time until Randall died Cheryl assumed Randall had in fact terminated the policy and gave it virtually no further thought. There would have been no purpose, therefore, in concealing from Randall her feelings for Baublit merely to forestall her removal as beneficiary under a policy she believed to be defunct. Actually, however, during early July, 1965, when she began to sense the depth of her feelings for Baublit, she wrote Randall of them and told him their prior relationship could no longer continue. They continued to correspond thereafter until the day before he died in full knowledge of their changed relationship. During that month (or even the preceding month when he first declared his intention to drop the policy), he made no effort to change the beneficiary, he made no request of Cheryl for the policy or that she give possession of it to the insurer (which, with his written request, were policy conditions precedent to change of beneficiary), no doubt because he never intended for a change of beneficiary to be made, but intended for the policy to be discontinued and believed it had been, as he had written Cheryl, then his mother, and then his aunt. And although Randall was under combat conditions in Viet Nam for much of this period, the mail was regularly delivered and, according to Corporal Riddle who served with Randall there, letters from home were regularly received within four or five days of posting. It is significant that Randall was a diligent and faithful correspondent. He wrote to Cheryl, his mother and aunts regularly during his service duty, even when under conditions of combat. The opportunity and means to express an intention to change beneficiary were reasonably available to Randall even under those conditions. He never manifested such an intention and we must conclude he harbored none.

Appellant then casually suggests that Cheryl fraudulently induced Randall to name her the beneficiary of his policy by a promise of marriage she never intended to keep. She contends that the designation "fiancee" itself indicates "that she misrepresented the very basis that initiated the issuance of the policy". This argument begs the proof. In equity, a state of mind, an existing purpose, may be misrepresented and thus constitute a misrepresentation of fact upon which actionable fraud may be based giving rise to a constructive trust. Wallach v. Joseph, Mo., 420 S.W.2d 289, 295 [4, 5]. We need only say that here proof of actual fraud is totally lacking. Proof of the designation "fiancee" alone is not proof of the state of mind that induced it. A high degree of oral proof is required to establish a constructive trust. The evidence must be so clear, cogent and convincing as to exclude all doubt from the mind of the chancellor. March v. Gerstenschlager, l. c. 8 [1]. Appellant's evidence falls far short of that requisite

proof and no right to a constructive trust appears on the basis of either actual or constructive fraud.

From this evidence we must conclude that the insurance proceeds came to Cheryl innocently. Yet, even though innocently received, if Cheryl is unjustly enriched thereby, her holding is inequitable and a constructive trust must be declared in favor of those wrongfully deprived of this expectancy. Bogert, 'Trusts and Trustees, Sec. 471. Throughout their relationship, Cheryl dealt with Randall openly, fairly and honestly. Randall's gift of the policy proceeds, in turn, was freely bestowed. As between the claimants only Cheryl was ever an intended beneficiary. Although Randall thought the policy had lapsed, he never intended for anyone other than Cheryl to receive the proceeds while it remained in effect. Therefore, appellant and those for whom she claims can have no legitimate expectancy to its benefits, are not wrongfully deprived of them, nor is Cheryl unjustly enriched by receiving them.

The judgment is affirmed.

All concur.