William G. CRITES and Norma A. Crites, his wife, Plaintiffs–Appellants,

v.

William SANFORD, Jr. and Effie Maxine Sanford, his wife, Defendants–Respondents.

No. 11493.

Missouri Court of Appeals, Southern District, Division Three.

Dec. 4, 1980.

Joe Perry Rice, III, David B. Summers, Rice & Summers, Chaffee, for plaintiffs–appellants.

Thomas L. Arnold, Benton, for defendants–respondents.

PER CURIAM.

This is a court–tried civil action, brought in three counts, alleging fraud (Count I), undue influence (Count II), and unjust enrichment (Count III), in a transaction involving the sale of real estate. At the close of the evidence, the court entered judgment in favor of defendants on all three counts.

On appeal, plaintiffs' sole point relied on is that "the court committed error in misapplying the law and by finding against the weight of the evidence that the plaintiffs did not establish a legal cause of action of unjust enrichment, when the evidence established the existence of a confidential relationship between the parties, a breach of that relationship and the resultant unjust enrichment of the respondents." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), mandates that we must affirm the trial court's judgment if there was substantial evidence to support the judgment, if the judgment was not against the weight of the evidence, and if the law was not erroneously declared or applied by the trial court. A summary of the evidence before the trial court is as follows.

William Sanford and Norma Crites are brother and sister. Apparently, they had a close family relationship throughout the years. They participated in joint business ventures, as well as social activities. Prior to July 27, 1973, Norma and William owned adjoining lots in what was described as a less desirable section of Scott City, Missouri. The record is somewhat murky as to the acquisition by Norma of her lot. Apparent-ly, it was given to her by her mother. William purchased his lot in 1960 for the sum of $50. At one time, William maintained a hog raising operation on the lots. The Crites' son had used the land for approximately one year as a site for his mobile home. Whoever was using the lots at the time assumed the responsibility of paying the taxes, as well as keeping the lots maintained. The Sanfords lived in the general area of the disputed lots while the Crites lived in neighboring Chaffee. During periods of time when the lots were not put to use by either family, William received citations issued by Scott City because of lack of weed control on the lots. Norma testified that both she and William had been told by their parents that there was a 99 year railroad lease on the lots. Consequently, both parties felt there could be considerable legal expense involved in obtaining an updated abstract and clear title opinion on the property. Apparently, Norma decided to relieve herself of any responsibility for the lot, and make a "complete gift" of her lot to William, but for some undisclosed reason the transaction was never completed.

In either late 1969 or early 1970, William was contacted by Elmer Divine, a consultant for neighboring Wetterau Food Corporation, who sought to purchase both lots. He said Wetterau was expanding their operation and wished to purchase the lots for a proposed roadway into their warehouse area. William relayed this information to Norma. Norma and William decided to place an $11,500 selling price on the lots—with William's being priced at $6,500 and Norma's at $5,000. William was to communicate the $11,500 sale price to Wetterau, which William said he did. Divine said William priced the lots at $30,000. William denied this. Later, Wetterau mailed letters to William and "Mrs. Phillip Crites", bearing a date of March 18, 1970, advising them that Wetterau was ceasing any further negotiations for purchase of the two lots, as they had obtained the needed property for their roadway from other area landowners. During the years of 1971 and 1972, no nego-

tiating was done by Wetterau, or any other outside party, with either William or Norma with regard to the two lots in question.

Based upon information gained at city council meetings by Mrs. Sanford, a journalist for a local newspaper, that Scott City was going to be zoned, William approached Norma about the possibility of their placing mobile homes on the lots before the zoning was approved. Norma stated that she was reluctant to do so and declined the proposition. William then told her that the lots were a source of irritation to both of them and made a proposal that Norma buy his lot for $300 or, if she did not wish to do this, he would buy her lot for $300. Norma determined that she did not wish to purchase William's lot, and said that she would sell him her lot for $300, if he would be responsible for obtaining an up–to–date abstract and title opinion, at his expense. This conversation took place on either December 6 or 8 of 1972. William gave Norma a check in the amount of $300 in payment for her lot, which she did not cash until the time the sale of the lot was completed on July 27, 1973. Both William and his wife testified that during this seven month period, they gave Norma the option of either tearing up their check and forgetting her sale agreement or, in the alternative, letting Norma buy their lot for $300. She did neither.

Later, Leonard V. Waldron, the general manager of Wetterau, gave his son, an attorney in Jackson, Missouri, named Kenneth Waldron, the authority to attempt to purchase the two lots for further company expansion. On or about August 18, 1973, William was again contacted by Elmer Divine of Wetterau with regard to purchasing the two lots, at which time Sanford declined to negotiate. Norma testified that Elmer Divine approached her with regard to purchasing her lot approximately "three months prior to December 6", offering her $1,500 for her lot, which offer she declined. However, Mr. Leonard Waldron stated Divine had no authorization from the company to negotiate for any acquisition of property at that time. Evidence was introduced that Divine had purchased other nearby properties in the area of the Wetterau operation for his personal gain.

In the late fall of 1973, William was contacted by Kenneth Waldron, requesting the opportunity to purchase the lots. William declined, stating he did not wish to sell the lots because his son had just graduated from a technician school and he was thinking about putting a building there for the son's television repair business and perhaps a building for a plumbing business for himself upon his retirement. During the period from September 1973 to December 7, 1973, negotiations continued between the Sanfords and Wetterau regarding the sale of the property, with the outcome being the eventual sale of the lots by William to Wetterau for the price of $32,500. After learning of the sale, plaintiffs sued defendants.

■ Plaintiffs argue here that a confidential relationship between William and Norma existed which was breached, resulting in unjust enrichment to defendants. They also urge that we find a constructive trust for their benefit. A constructive trust is a formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. The evidence to support a constructive trust must be clear, cogent and convincing, and leave no room for a reasonable doubt as to the existence of the trust in the mind of the trier of fact. *Service Life Insurance Co. of Fort Worth v. Davis*, 466 S.W.2d 190, 197 (Mo.App.1971). No such evidence appears in the record.

In its findings of fact and conclusions of law, the trial court found:

"As to Count I, . . . the Court finds that plaintiffs did not prove that the conveyance . . . was procured by the intentional, material, and fraudulent misrepresentation of the defendants . . . . [t]he plaintiffs were not induced to convey the property by misrepresentation of the defendants. There was no evidence that the defendants had a superior knowledge

of the value of the land. At the time of the sale between the parties, defendants were not acting as agents of the plaintiffs. . . .

"As to Count II, . . . the defendants made an offer to . . . either buy plaintiffs' lot for $300.00 or to sell their lot for $300.00; that plaintiffs considered said offer and decided to sell their lot for $300.00; and the findings made as to Count I are applicable here.

"As to Count III . . . plaintiffs sold their lot to defendants for $300.00. Based on defendants' testimony, they were willing to sell their lot to plaintiffs for $300.00. So, as between the parties, the value of the property in December 1973 could be said to be $600.00.

"The defendants did sell the two lots to Wetterau, Inc., in December 1973, about one year later, for $32,500.00. One could argue that since the defendants made a 'profit' of about $32,000.00, that especially between brother and sister, the 'profit' should be shared between the two. Such an argument is grounded on a moral basis and morally would appear to be sound.

"However, this Court is called upon to rule on a legal cause of action, not on moral issues. The plaintiffs have not established a legal cause of action of unjust enrichment. . . ."

There was substantial evidence given at trial to support the court's findings. The judgment was not against the weight of the evidence, nor was the law erroneously declared or applied.

The judgment is affirmed.

All concur.