Goldie BECK, Respondent,

v.

**Larry BECK and Sue Beck, Appellants.**

No. 14722.

Missouri Court of Appeals,
Southern District,
Division One.

April 28, 1987.

Ronald D. White, Rolla and Joseph W. Rigler, Joplin and J. Max Price, Salem, for appellants.

Mark Roberts, Steelman, Hearne & Hearne, Salem, for respondent.

CROW, Chief Judge.

Goldie Beck ("plaintiff") sued her only child, Larry Beck ("Larry"), and Larry's wife, Barbara Sue Beck ("Sue"), seeking, among other relief, the declaration of a constructive trust on nine certificates of deposit and one parcel of real estate.

A non-jury trial produced a judgment declaring Larry and Sue (henceforth referred to collectively as "defendants") constructive trustees "as to the entire principal" of eight certificates of deposit, and constructive trustees as to the principal of a ninth certificate "to the extent of [p]laintiff's contribution" thereto. The aggregate amount of principal for which the constructive trust was impressed was $82,710.28. The judgment also declared that defendants were constructive trustees as to certain interest due plaintiff on the nine certificates, in the aggregate amount of $14,-594.39. Additionally, the judgment declared that defendants were constructive trustees for plaintiff as to all cash and currency held in defendants' safety deposit box, to the extent of the two sums set forth above.

In regard to the real estate—a "brick building" in Ellington, henceforth referred to as "the Ellington property"—the judgment declared that Larry held legal title thereto as a joint tenant with plaintiff. The judgment further declared that Larry held his interest as constructive trustee for the use and benefit of plaintiff, that plaintiff was entitled to have "sole legal title" to said property conveyed to her, and that plaintiff was entitled to exclusive possession thereof. The judgment commanded *both* defendants to execute a deed conveying all their right, title and interest in the Ellington property to plaintiff, and provided that if defendants failed to do so within ten days, the judgment would have the effect of such a conveyance.

Defendants appeal, challenging *only* the portion of the judgment pertaining to the Ellington property; they do not attack any portion of the judgment regarding the certificates of deposit or the contents of their safety deposit box. Defendants' assignments of error are easier understood after a synopsis of the evidence.

Plaintiff, age 68 at time of trial,[1] is the widow of Eugene Beck (Larry's father), who died June 18, 1962. When Eugene

---

1. Trial occurred January 31, 1986.

died, he and plaintiff owned—presumably as tenants by the entirety—two farms in Reynolds County. Plaintiff testified, without contradiction, that she sold the farms in 1962 and 1963, receiving a total of $45,-000, part of which she invested in certificates of deposit "in the name of Goldie Beck or Larry Beck," and part of which she invested in "mutual funds."

Plaintiff recounted that she suffered a "nervous breakdown" in 1963, for which she was hospitalized in St. Louis, receiving psychiatric care and shock therapy.

In 1966, as we understand plaintiff's testimony, she used some of the money she had received from the sale of the farms to purchase the Ellington property, title to which was apparently taken in her name alone. Plaintiff explained, "I lease it out as a post office." Plaintiff testified, and Larry conceded, that at all times since the Ellington property was purchased, plaintiff has received all the rental income from it, paid the insurance and taxes on it, and reported all such amounts on her income tax return.

As the years went by, plaintiff maintained her investments in certificates of deposit, continuing to have each one issued in the joint names of herself and Larry. Plaintiff received all the interest from the certificates, and reported it on her income tax return. She kept the certificates in a "lock box at the bank," which was likewise carried in both names. Asked why she used both names, plaintiff answered, "Larry wanted me to put his name on everything so that if, so it wouldn't have to go through the probate court if anything happened to me and so that he could take, get into the box or take care of the business, whatever had to be done like doctor bills or hospital bills."

In 1977, plaintiff, who had been working as a cook in various restaurants for several years, suffered a broken arm, and also experienced another "nervous condition." These afflictions caused her to take up residence with defendants[2] in their home at Salem where, according to Larry, plaintiff remained approximately nine months.

During this period, on November 30, 1977, plaintiff executed a general warranty deed conveying the Ellington property to herself and Larry as joint tenants, and plaintiff also executed a power of attorney which, according to the transcript, authorized Larry "to deal with" the Ellington property. There was a conflict in the evidence as to how this came about.

Neither side specified any fact issues for the trial court to resolve, and the trial court filed no findings of fact. Consequently, all fact issues must be considered as having been found in accordance with the result reached. Rule 73.01(a)(2), Missouri Rules of Civil Procedure (17th ed. 1986); *Mills v. Cameron Mutual Insurance Co.*, 674 S.W.2d 244, 249[3] (Mo.App.1984); *Hazlett v. Clark*, 652 S.W.2d 135, 136[3] (Mo.App. 1983). With that in mind, we set out only the evidence favorable to plaintiff regarding the origin of the 1977 deed and power of attorney.

Plaintiff testified, "... I was sick whenever [Larry] went down and had this deed, all this wrote up and the power of attorney and everything, and he come up there and got me and told me I needed to go down there and sign some papers and I did, and whenever I signed them, well, I found out this is what I signed." According to plaintiff, the two instruments were prepared by an attorney whom she had not previously met. The purpose of the documents, in plaintiff's words, was: "... so that Larry could take care of the business if I was sick and couldn't do it or couldn't get down there and so that in case of my death, why it would automatically go to him." Plaintiff insisted she did not ask Larry to have the documents prepared. Plaintiff testified, "He done it and he requested me to go sign it."

Nothing of consequence occurred the next four years, during which plaintiff continued to receive the interest from all certificates of deposit titled jointly in her and Larry's names, and the rental income from the Ellington property.

---

**2.** Larry, born in 1943, had been married to Sue 22 or 23 years at time of trial.

In April, 1982, plaintiff had nine jointly titled certificates of deposit in the lock box she shared with Larry. Unbeknown to plaintiff, Larry removed the certificates from the box, and stashed them in another lock box, rented in his name and Sue's. Asked how she discovered this, plaintiff testified: "He come home, he was really, he was drunk and he throwed his lunch pale [sic]. I was cooking dinner for him. He throwed his lunch pale [sic] over in the sink where I was fixing the food and he told me he had got my goddamned money, got my goddamned title and he said, now I am going to declare you incompetent and I am going to take every goddamned thing you got."

This incident, according to plaintiff, occurred at defendants' house. Plaintiff explained that she was cooking dinner there because Sue was sick.

Larry's excuse for seizing the certificates was that on several occasions he had seen one Bob Ferrell at plaintiff's house, and on one such occasion had "caught him in my mother's bed." Larry maintained he took the certificates soon afterward "[b]ecause I didn't want someone running off with my money."

Plaintiff admitted that Ferrell had been in bed at her house on the occasion described by Larry, but plaintiff insisted she was not in bed, and that she was going to sleep in another room. Plaintiff added that this incident took place *after* Larry had commandeered the certificates.

As we comprehend the record, Larry kept the nine certificates in his and Sue's lock box from the time he seized them until July 23, 1983. On that date, Larry signed nine promissory notes, each payable to First National Bank of Salem. As collateral for each note, Larry pledged a separate certificate. Each note was in the identical amount of the certificate securing it, and each note was due on the maturity date of the certificate securing it, so that the proceeds of such certificate would pay such note.

With the proceeds of the nine notes—a total of $87,905.42 as we understand the testimony—Larry purchased two certifi-cates of deposit, each bearing his and Sue's names, one for $50,000 and one for $37,-905.42. The interest earned by these two certificates went to Larry and Sue. Larry later shifted the borrowed money into other investments, and ultimately spent an undetermined amount. As the portion of the judgment pertaining to the certificates of deposit is not in issue on this appeal, we need not attempt to trace each dollar. Instead, we focus on the Ellington property, the subject of this appeal.

Defendants' first assignment of error maintains that the imposition of a constructive trust on the Ellington property was against the weight of the evidence and unsupported by substantial evidence, in that imposition of a constructive trust requires proof of fraud or undue influence, and the evidence at trial was insufficient to support a finding of fraud or undue influence. Defendants insist the evidence established that plaintiff executed the 1977 deed to herself and Larry "as a sort of estate planning device," and that her reason for attempting to regain sole ownership of the Ellington property was Larry's seizure of the certificates of deposit four and a half years later.

In support of that contention, defendants direct us to the following excerpt from plaintiff's testimony:

"Q. ... Now from and after November of 1977, up until April of 1982, did you ever make any complaints to Larry Beck or anyone else about the [1977] deed ...?

A. No, not as long as Larry would have treated me right, I would have left it like it was.

Q. All right.

A. I would have felt like that is the way it should be."

The above testimony, say defendants, confirms that "[plaintiff's] complaint dealt not with Larry Beck's acquisition of the land, but with an unrelated matter" (Larry's expropriation of the certificates in 1982).

Plaintiff, answering defendants' first point, does not contend that Larry was guilty of "actual fraud" regarding the 1977

deed. Instead, plaintiff asserts that a constructive trust may arise regardless of the intention of the parties, and is used as a remedy to prevent unjust enrichment. In support of that position, plaintiff cites *Cave v. Cave*, 593 S.W.2d 592 (Mo.App.1979), and *Murphy v. Olds*, 508 S.W.2d 249 (Mo.App. 1974). Neither case aids her.

In *Cave*, a father conveyed two tracts of land to a son, reserving a life estate. The father then commenced construction of a house on one tract, intending to occupy it for the time necessary to achieve a capital gain posture. When the structure was nearly finished, the father received an inquiry from a third party about buying the property. The father approached the son about conveying the property, but the son refused. The father sued the son, seeking to set aside the deed or, in the alternative, to impose a constructive trust. At trial, the father admitted one of his objectives in executing the deed had been to avoid probate. The trial court denied relief.

On appeal, the opinion noted that the father failed to prove actual or constructive fraud, and there was no evidence of a confidential relationship between him and the son. There was likewise no evidence that the son exerted undue influence over the father, an element that must be proved when relief is sought on the basis of breach of a confidential relationship. *Id.* at 596. Observing that it was the voluntary and knowing act of the father, unaltered by any actual or constructive fraud by the son, which created the condition that caused the father to sue, the appellate court upheld the denial of relief. *Id.* at 597.

In *Murphy*, there was an agreement between Murphy and Olds that they would acquire a fire-damaged house, Murphy would repair it, and Olds would market it. The sale proceeds, after payment of the acquisition costs and repair expenses, would be divided equally. They proceeded as planned, but there was no ready buyer. Consequently, they agreed to delay the sale long enough to qualify it as a capital gain. Title was placed in Olds and his wife, and they moved in, with the understanding they would make the installment payments on a loan against the property during their occupancy. The Oldses subsequently refused to honor the agreement with Murphy, and he sued for partition. The trial court granted that relief.

The appellate court understood the trial court's decree "as a determination of a constructive trust in land in favor of [Murphy] arising from the breach of an oral agreement between persons in a fiduciary relationship to share the increment in the value of the land brought about by their joint efforts." *Id.* at 251. The opinion added:

"A constructive trust ... is not a technical trust but a device used by a court of equity to provide a remedy in cases of actual or constructive fraud to prevent unjust enrichment.... And since a breach of a fiduciary or confidential relationship is itself a constructive fraud, if such a relationship is shown between the putative trustee and beneficiary, no proof of actual fraud is necessary in order to establish a constructive trust.... Thus, the availability to [Murphy] of the constructive trust remedy does not derive from an imputation of actual fraud, but from the breach of the fiduciary relationship which subsisted because ... 'to permit [the Oldses] to retain the property thus procured would tend to induce fraud and would be against public policy upon the true owner doing equity.'" *Id.* at 252.

The appellate court upheld the trial court's decree.

The difference between *Murphy* and the instant case is immediately apparent. In *Murphy*, there was an agreement between the parties that the property would be acquired, repaired and sold. The property was acquired and Murphy repaired it, but the Oldses then reneged on the promise to sell.

In the instant case, plaintiff's execution of the 1977 deed did not result from any agreement between her and Larry. The deed and the power of attorney, by plaintiff's own admission, were made so that Larry could take care of any business regarding the Ellington property if she were

unable to do so, and so that the property would automatically become Larry's in the event of her death. Larry did not obligate himself to do anything in return for the 1977 deed, and, as matters turned out, it was never necessary for him to exercise any authority conferred by the power of attorney. Plaintiff ultimately revoked the power of attorney in May, 1982, after learning that Larry had taken the certificates.

Additionally, the incident that motivated plaintiff to try to regain sole ownership of the Ellington property had nothing to do with the circumstances attending the execution of the 1977 deed. Plaintiff, as we have seen, conceded she made no effort to regain sole title to that property until Larry seized the certificates, and that had he not done so, she would have left the title as it was.

Two other cases relied on by plaintiff are *McFarland v. Braddy*, 560 S.W.2d 259 (Mo.App.1977), and *Skidmore v. Back*, 512 S.W.2d 223 (Mo.App.1974). *McFarland* stands for the proposition that if a fiduciary or confidential relationship exists between the alleged trustee and the beneficiary, proof of fraud is not required to establish a constructive trust. 560 S.W.2d at 264[4]. *Skidmore* stands for the proposition that where a confidential relationship exists between an alleged donor and an alleged donee, a purported gift is presumptively void, and the burden is on the alleged donee to establish the validity of the gift. 512 S.W.2d at 229[4].

In order for *McFarland* and *Skidmore* to help plaintiff, it is obvious that the evidence would have had to be sufficient to support a finding that a confidential relationship existed between plaintiff and Larry at the time plaintiff executed the 1977 deed. We consequently address that issue.

Plaintiff acknowledges that blood relationship between parties to a deed is, by itself, insufficient to show a fiduciary relationship. *Beach v. Beach*, 207 S.W.2d 481, 486[6] (Mo.1947). She argues, however, that blood relationship is nonetheless a factor to be considered in determining whether a confidential relationship exists. *Harlan v. Bishoff*, 649 S.W.2d 230, 233

(Mo.App.1983). As noted in *Harlan*, a confidential relationship cannot be precisely defined, but is generally synonymous with a fiduciary relationship. *Id.*

Equity does not limit the circumstances wherein a fiduciary relationship may exist, but will look for those instances where a special confidence is reposed on one side with a resulting influence on the other. *Mahler v. Tieman*, 550 S.W.2d 623, 628[9] (Mo.App.1977). The question in determining whether a fiduciary or confidential relationship exists is whether trust is reposed with respect to property or business affairs of the other. *Id.* at 628[10].

The only evidence suggesting that a confidential relationship existed between plaintiff and Larry at the time plaintiff executed the 1977 deed and power of attorney was that plaintiff, because of her broken arm and nervous condition, was unable to take care of herself, and consequently found it necessary to live with Larry and Sue for nine months. Endeavoring to show that she relied on Larry to handle her business during that period, plaintiff directs us to the following excerpt from Larry's deposition:

"Q. And what did [plaintiff] say?

A. She told me that she wanted me to take care of the business and she said she would sign it to where that I could.

Q. Why did she, do you know why she wanted you to take care of the business?

A. She said she was sick and she wasn't able.

Q. And was she sick at that time?

A. Yes.

Q. What was her sickness?

A. She had a broken arm.

Q. Anything else?

A. She had had some nerve problems with it."

There was, however, no evidence that plaintiff, either prior to or contemporaneously with the execution of the 1977 deed, entrusted any aspect of her financial affairs to Larry, or that she ever relied on him in any way for financial guidance. While plaintiff, at the time she signed the deed and power of attorney, may have feared she would become incapacitated and

unable to handle her business, matters did not turn out that way, as demonstrated by plaintiff's testimony:

"Q. ... what I am getting at, Mrs. Beck, you were not physically incapacitated so you couldn't handle your business with the post office in 1977, were you?

A. No, I took care of it.

Q. Took care of your affairs in '77, didn't you?

A. Yes.

Q. All right. So in 1977 you were not in ill health or incapacitated, you went to work. Now you did have a broken arm.

A. I had a broken arm and I had a nervous condition.

Q. But with your nervous condition, didn't you continue to do your business and handle your affairs?

A. Yes, I did."

It is thus clear that plaintiff never consigned the management of her financial affairs to Larry, and that although she was willing to do so in 1977 had the need arisen, it never did.

In sum, plaintiff concedes in her brief that Larry was guilty of no fraud regarding plaintiff's execution of the 1977 deed and power of attorney, and plaintiff's own testimony, quoted above, reveals that no confidential relationship existed between plaintiff and Larry at the time plaintiff executed those documents.

Evidently apprehensive about the absence of those elements, plaintiff argues that a constructive trust can be imposed even without a finding of fraud or the existence of a confidential relationship. Plaintiff does not, however, cite any case supporting that hypothesis. Indeed, *Service Life Insurance Co. of Fort Worth v. Davis*, 466 S.W.2d 190 (Mo.App.1971), cited by plaintiff, teaches otherwise. It states: "When property has been *acquired* in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Id.* at 195. (Emphasis added.) In the instant case, as we have seen, there was nothing malevolent in Larry's *acquisition* of his interest in the Ellington property. While his conduct more than four years later in distraining the certificates of deposit (inferably plaintiff's life savings) was reprehensible, such misdeed had nothing to do with plaintiff's execution of the 1977 deed.

We fully understand the trial court's desire to rescue plaintiff from the woe she now suffers because of the 1977 deed; however, for the reasons heretofore set out, we are constrained to hold that as a matter of law the evidence fails to establish any ground on which a constructive trust can be impressed on the Ellington property. Simply put, the law does not enable plaintiff to recover, by the remedy of constructive trust, the interest in the Ellington property that she knowingly and voluntarily granted Larry in the 1977 deed, merely because years later he proved undeserving of her largesse.

Having reluctantly reached that conclusion, we need not address defendants' other assignment of error, which maintains that inasmuch as the judgment did not declare Sue a constructive trustee for plaintiff as to the Ellington property, the trial court erred in commanding Sue to execute a deed conveying all of her right, title and interest therein to plaintiff.

Those portions of the judgment (a) declaring that Larry holds his interest in the Ellington property as constructive trustee for plaintiff, (b) determining that plaintiff is entitled to have sole legal title conveyed to her, and is entitled to exclusive possession of said property, (c) commanding defendants to execute a deed conveying all their right, title and interest in such property to plaintiff, and (d) providing that if defendants fail to do so within ten days, the judgment will have the effect of such conveyance, are reversed. In all other respects, the judgment is affirmed.

Costs of this appeal are taxed against plaintiff.

GREENE, P.J., and LAWRENCE O. DAVIS, Special Judge, concur.