**In re ESTATE of Mary BENNETT, Deceased, Grace White, et al., Appellants,**

v.

**Walter L. MULVANIA, et al., Respondents.**

No. WD 31864.

Missouri Court of Appeals, Western District.

June 16, 1981.

Joseph L. Flynn, St. Joseph, for appellants; Dale, Flynn, Mendell & Barnes, St. Joseph, of counsel.

Theodore M. Kranitz, Kathy J. Kranitz, St. Joseph, for respondents.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

PRITCHARD, Presiding Judge.

By third amended petition plaintiffs alleged themselves to be the heirs of the deceased husband of Mary Bennett, deceased, and sought distribution of the residue of her estate to them under Article VII of her will. That article gave the residue of the estate to Mary Bennett's daughter, Lucy Ann Smith, who predeceased her on December 5, 1973. Lucy Ann had two adopted children, defendants Joseph Lionel Smith and Cinthia Ann Smith.

It is the theory of plaintiffs that an Oregon attorney, Stephen A. Lovejoy, while acting in a confidential relationship with Mary Bennett, fraudulently advised, counselled and persuaded her to permit him to take custody of Joseph and Cinthia, obtained her written permission to be appointed their guardian, and told her that he would adopt them. That Mary Bennett knew that by the adoption, Joseph and Cinthia would no longer be her heirs. That Lovejoy had no intention of adopting the children until after Mary Bennett's death, so that they would, in fact, be her heirs. Lovejoy was appointed guardian but has failed and refused to adopt the children. That Mary Bennett, through the balance of her life, believed that the children had been adopted by Lovejoy and that the residue provision of Article VII of her will would be distributed under the laws of descent and distribution of Missouri; that she had no surviving kindred or relative by blood and that plaintiffs, the heirs of her prior deceased husband would receive that portion of her estate, and Joseph and Cinthia would not benefit from the provision. It was finally alleged that by reason of Lovejoy's fraudulent misrepresentation while acting in a confidential relationship, Mary Bennett was effectively induced not to change her will so as to show her true intent and will. It was prayed that a constructive trust be declared and that the residue of the estate be distributed to plaintiffs. It was held in *White v. Mulvania*, 575 S.W.2d 184 (Mo. banc 1978), that a second amended petition, which is substantially the same as the instant petition, stated a cause of action.

According to a response to plaintiffs' application to file supersedeas bond, the estate had personalty of $500,000 and real estate estimated at $1,000,000 in Missouri, and a balance of about $275,000, exclusive of real estate in Iowa.

Trial was to the court which entered judgment against plaintiffs, finding that there was no evidence of actual or constructive fraud; that no constructive trust should be imposed on Mary Bennett's estate, and that defendants, Joseph Lionel Smith and Cinthia Ann Smith, are her lawful heirs.

It is plaintiffs' basic position here that the evidence, considered in its most favorable view, established that decedent was induced not to change her will by reason of the actual fraud of attorney, Lovejoy, who promised to adopt the two children.

Walter Mulvania, an attorney of Rock Port, Missouri, was employed by Mary Bennett to write her will on January 6, 1972, which will was admitted to probate. He had met her daughter one time, and after her death, he talked with Mary. He knew that the daughter had two adopted children, and Mary told him that they were in the care of Lovejoy, and that they had been or were being adopted by him. Mulvania advised her that if the children had been adopted, they could not inherit from her, and he suggested that if she had no known heirs she should rewrite her will to carry out her desires. She indicated she was going to do so, and discussed it with him on more than one occasion, but "[w]e never got around to ever writing it, because she wandered off and wasn't decided as to what she wanted to do." The children were omitted from being named in the first application

for letters filed by Mulvania because he assumed that they had been adopted, but on learning that they had not, an amended application was filed by him. Later, while in Mulvania's office, Lovejoy made the statement he did not know where she (Mary) got the idea (of adoption), "that he wasn't about to adopt them and cut them off from their inheritance."

Eunice (Mrs. Walter) Mulvania did Mary's income tax return. After the daughter's death, Mary told her that the children were in Lovejoy's home, a loving home, were well taken care of, and Lovejoy was adopting them. Eunice encouraged her to set up a fund for their education, and Mary said she would think about it, but she did not oppose it. Just before Mary died, Eunice asked her about the adoption and she said that Mr. Lovejoy had told her there were some more papers to be signed.

Ben Shull had a conversation with Mary, whom he had known for 20 or 25 years, just after she got back from her daughter's funeral. She told him that there were two adopted children whom she was putting back up for adoption. She did not say anything one way or the other about the children receiving her estate. "She said—About all I can remember her saying, is that she put them up for adoption, and she was wondering what would happen to her estate if something would happen, if they would get it or something." Ben advised her that if she did not want the children to have it, she had better see a lawyer and make a will. Mary appeared to be in good health at the time.

Leo R. Guyer had a conversation with Mary after she came back from the funeral in which she told him that the children were being looked after by an attorney. She told him that she was unhappy about her daughter adopting the children. Hugh Gardner testified over objection but without ruling that Mary "understood" that the children were being readopted.

Hazel Vogel went with Mary Bennett to Oregon for the daughter's funeral, and on arriving there, they first went to the hospital about an autopsy. After the funeral, Lovejoy had a paper concerning the children for Mary to sign which she did. Hazel did not hear the word adoption used, that Mary asked Lovejoy if he would adopt the children, or that he offered to Mary to adopt them. After she and Mary returned to Missouri, Hazel heard her speak fondly of the children, but she never referred to them as being adopted or going to be adopted, or that she believed them to be out of her line of inheritance. At some time, either before or after Lucy's death, Mary told Mrs. Vogel that she had her will fixed so the Whites (plaintiffs) could not get any of her money. The first Christmas after Lucy died, Mary sent money for the children. When she was in Lincoln City, Oregon, she took the children for a ride on a Sunday.

Sister Grace Michael Perry was a nun at Saint Augustine Parish in Lincoln City, Oregon. About the time of Lucy's death, she talked with Lovejoy about taking the children into his home. He told her he would be happy to have them; he would treat them as his own; and it was his eventual plan to adopt them. Mary Bennett told Sister Grace that she was not going to leave the children anything. Sister Mary Cecelia and Sister Grace relayed the information to Mary Bennett about what Lovejoy said about adopting the children. Sister Grace participated in a case to regain custody from Lovejoy because there was concern that the children were no longer being brought up in the Catholic Church, which was Lucy Smith's desire.

Sister Mary Cecelia Cantera was in Lincoln City, Oregon, in 1973, and became acquainted with Lucy Smith. She introduced Lucy to Lovejoy who wrote her will, in which Sister Mary Cecelia was named as trustee for the children, and nominated as their guardian. Lucy died about 5 days later. When Mary Bennett arrived for the funeral, there was a conversation in which Mary said to Lovejoy, "So you're going to adopt the children." Sister Mary Cecelia did not recall Lovejoy responding, but he did not protest that he was not going to adopt the children. On December 12, 1973, she signed a nomination that Lovejoy be

appointed guardian of the persons and estates of the children. Later, she asked him when he was going to adopt the children, and he said, " 'Oh, I don't intend to adopt them until after Grandma dies.' He says, 'I'm using my head.' " In an Oregon Circuit Court proceedings to remove Lovejoy as guardian/conservator, he was allowed to remain as guardian, but the United States National Bank of Oregon was appointed conservator of the children's estate.

Stephen A. Lovejoy met Mary Bennett when she came to Oregon after Lucy's death. He had her sign a nomination and request that he be appointed guardian of the children, and he was so appointed. He denied that there was ever any conversation with Mary Bennett while she was in Oregon, or at any time, about adopting the children. There was a conversation about guardianship. He took no step either before or after Mary Bennett's death to adopt the children, and did not intend to do so.

Phyllis Robel was at one time the wife of Lovejoy. They lived together in 1973 in Lincoln City, Oregon, and separated in 1975. Phyllis lived in Alaska at the time of trial, and travelled therefrom upon a plane ticket furnished by her respondents' counsel. She was called as a witness by appellants. A tape recording of a conversation was had between her and appellants' counsel in February, 1979. Phyllis acknowledged she had heard the (taped) conversation and had gone over it. She identified a transcript of the tape. An examination of that tape fails to show anything concrete about Lovejoy having made an agreement with Mary Bennett to adopt the children. Phyllis testified: "Q. (By Mr. Flynn) And in that conversation did we discuss the fact that Stephen Lovejoy had told you he made an agreement with Mary Bennett to adopt the children? A. No, we did not. * * * Q. (By Mr. Flynn) I will ask you one more time, did Stephen Lovejoy say anything about agreeing with Mary Bennett to adopt the children? Never in my presence. Q. Never in your presence? A. Never. * * * Q. All right. Then we were discussing if Mr. Lovejoy had made a deal with Mary Bennett? A. You were discussing that Mr. Lovejoy

had made a deal with Mary Bennett. I was lying. * * * Q. In other words, you're saying that everything you told me prior to today, or prior to depositions, was a lie? A. That's right."

What this evidence shows is merely that Lovejoy was acting as former attorney for Lucy Ann Smith in drafting her will, and in serving as appointed executor of her will at the only time that Mary Bennett had direct contact with him in Lincoln City, Oregon. There is nothing to show that he was acting for Mary Bennett in any individual capacity other than in looking after the adopted children of Lucy Ann. As to evidence that there existed a "special confidence" reposed by Mary Bennett in Lovejoy, by reason of his role in looking after the adopted children, it is insufficient to show that Lovejoy made any definite, direct promise to Mary Bennett that he would, in fact, adopt the children [and thus take them out of Mary Bennett's bloodline for inheritance purposes]. (See page 189 of White v. Mulvania, supra.) Any repose of special confidence by Mary Bennett in Lovejoy that he would adopt the children comes only from the evidence of her ex parte beliefs or misapprehensions, based upon what others may have told her, and not from any direct promise by him. The evidence tending to show that Mary Bennett entertained a belief that Lovejoy was going to adopt the children may be inferred from this evidence: She said to Lovejoy, "So you're going to adopt the children", to which he did not object, but did not respond according to Sister Mary Cecelia Cantera; Mary Bennett told her lawyer, Walter Mulvania, that the children were in Lovejoy's care and that he was going to adopt them. She was advised by Mulvania that if the children were adopted, they would not inherit from her. Mulvania suggested that she should rewrite her will, but she never got around to it. Mary also told Eunice Mulvania that Lovejoy was going to adopt the children, and when Eunice asked Mary about it just before her death, she said that Lovejoy had told her that there were some more papers to be signed. Mary also told Ben Shull that

the children were being put back up for adoption by her, and Hugh Gardner testified that she "understood" that the children were being readopted. Sometime after Lovejoy was appointed guardian of the children, Sister Cantera asked him when he was going to adopt them, and he answered that he did not intend to adopt them until after Grandma dies, and "I'm using my head."

Phyllis Robel, former wife of Lovejoy, although admitting that she had lied in previous encounters with appellants' counsel, testified unequivocally that Lovejoy had not ever, in her presence, said anything about adopting the children.

Stephen A. Lovejoy denied that there was ever any conversation with Mary Bennett about adopting the children at any time. He testified that he took no steps to do so, and did not intend to do so.

There was not one whit of direct testimony that Lovejoy ever promised Mary Bennett that he would adopt the children other than what inference could be derived from Sister Cantera's testimony that he told her he would not adopt them until after Mary died. All of the evidence, in its varying degrees of contradiction, was for the trial court to evaluate. *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, 432 S.W.2d 245, 254[12] (Mo.1968); and the trial court could disbelieve any testimony even when uncontradicted. *Dambach v. James*, 587 S.W.2d 640, 643[7, 8] (Mo.App. 1979), and cited case. It has long been the rule that the evidence to establish a constructive trust (as is here attempted) must be so clear, cogent, unequivocal and positive as to banish doubt in the chancellor's mind. *Yax v. Dit-Mco, Incorporated*, 366 S.W.2d 363, 367[6, 7] (Mo.1963); *McFarland v. Braddy*, 560 S.W.2d 259 (Mo.App.1977). The burden of proof to establish a constructive trust was, of course, upon appellants. Under the standard of review of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), it is found that the judgment is not against the weight of the evidence; it does not erroneously declare or apply the law; and there is no firm belief that the judgment is wrong. In fact, under this record, if the judgment had been for the appellants, there would have been considerable question as to whether it could have been sustained.

Respondents have requested damages for frivolous appeal. That request is denied. In view of the result reached herein, it is unnecessary to consider whether appellants, as alleged heirs of Mary Bennett, deceased, had standing to sue as contended by respondents.

The case below arose from an appeal from the probate court by appellants for a determination of heirs, and the cause to establish a constructive trust, which cases were consolidated for trial. The trial court affirmed the probate court order determining that the infant defendants were the heirs of Mary Bennett, deceased; and sustained the motion to dismiss at the close of plaintiffs' case the petition for establishment of a constructive trust, entering judgment.

The judgment, as entered, is affirmed.

All concur.