Thomas E. CRANE and John H. Crane,
Plaintiffs-Appellants,

v.

CENTERRE BANK OF COLUMBIA as
Trustee, et al.,
Defendants-Respondents.

No. WD 35222.

Missouri Court of Appeals,
Western District,
Division One.

April 23, 1985.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
May 28, 1985.

Application to Transfer Denied
June 25, 1985.

Raymond C. Lewis, Jr., Gena J. True-blood, Columbia, for plaintiffs-appellants.

Stephen C. Scott, Jones & Scott, Columbia, for defendants-respondents.

Before KENNEDY, P.J., and NUGENT and BERREY, JJ.

BERREY, Judge.

Plaintiffs Thomas E. Crane and John H. Crane appeal from an adverse judgment of the Circuit Court of Boone County on an action to remove 240 acres of land from a trust under the alternative theories of constructive trust or of an oral express trust.

Judgment is affirmed.

In 1904, Darius Worthington Crane purchased the property in question for $8,400.00. The property is a 240 acre farm located on a southern edge of Columbia, Missouri, and divided by Rock Quarry Road with 160 acres on the east side and 80 acres with a dwelling house on the west side. Darius Crane lived on the farm with his wife, Roxie Lee, and their twelve children, one of whom was Joe, and another of whom was Henry, the father of the plaintiffs. Another child, Nell Proctor, was a witness for the defendants. Roxie Lee Crane died in 1933 owning under her own name some real estate which was divided into twelve parts at her death.

In 1945, two years before his death, Darius sold the 240 acre farm to his son Joe Crane and Joe's wife Meda, a childless couple, by a deed absolute on its face. This 1945 transaction is the original basis for this suit. After the sale, Darius continued to live on the farm in the main house until several months before his death when he

became ill and moved into town to live with his daughter Nell.

In 1957, Joe and Meda executed a joint will providing that the survivor of the two would leave the farm to Tom and John, their nephews; Tom would receive the farming acreage and John would receive the portion where the dwelling house was located. The will contained a provision granting either party the power to revoke. On the same day, using the same witnesses, Joe also executed a simple will leaving everything to Meda. After Joe died, Meda filed the short will with the probate court. The plaintiffs Tom and John filed a motion in the probate court to compel production of the joint will. Meda then voluntarily filed the joint will. There was no probate estate administered for Joe Crane and court records fail to reveal an explanation for the two different wills. The property passed to Meda by joint tenancy.

In 1982, about one year before her death, Meda set up a trust with the defendant bank as trustee and conveyed the farm to the trust. Beneficiaries of the trust included relatives of Meda's family, certain grandchildren of Darius Crane, and charities. Plaintiff John Crane was named as a beneficiary but Tom was not.

Plaintiffs brought the action below seeking to remove the land from Meda's trust based on alternative theories, the first seeking the imposition of a constructive trust and the second seeking the determination that an oral express trust was removed from the Statute of Frauds by full or part performance or by an adequate written memorandum. Plaintiffs alleged that at the time of the conveyance, Darius and Joe and Meda expressly agreed that Darius was to retain a life estate in the property and that upon the death of Joe and Meda, the property would be left to the plaintiffs Tom and John, who were grandsons of Darius and nephews of Joe. Plaintiffs named the bank and all trust beneficiaries as defendants.

Plaintiffs allege on appeal six points of trial court error: (I) failure to find a contemporaneous agreement existed upon conveyance of the farm between Darius Crane and Joe and Meda Crane to ultimately leave the Crane farm to the plaintiffs; (II) failure to find a confidential relationship existed between Darius Crane and his son Joe Crane; (III) failure to find that the transfer of land from Darius Crane to Joe and Meda Crane was in anticipation of his death and requiring plaintiffs to prove anticipation death was the primary motivation for the transfer and Darius Crane had to be in apprehension of immediate death; (IV) failure to allow admission of Meda Crane's hospital records and the testimony of her physician; (V) failure to admit certain testimony of the plaintiffs on the basis of the Dead Man's Statute, and; (VI) in general, the judgment was against the weight of the evidence and deference to the findings of the trial court is not required because the testimony establishing and describing the agreement was essentially uncontradicted.

On review this court is governed by the standard that the judgment of the trial court must be affirmed unless there is no substantial evidence by which it is supported, it is against the weight of the evidence, or the law was erroneously applied. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The power to set aside a judgment on the grounds that it is against the weight of the evidence should be exercised only with caution and with a *firm belief* that the judgment is wrong. *Id.*, at 32. Due deference should be afforded to the trial court's ability to judge the credibility of the witnesses. *Id.* In the instant case, the trial judge made no finding as to the credibility of the witnesses. Much of the testimony was elicited from unbiased witnesses and was basically uncontradicted. However, the mere fact that the evidence was uncontradicted does not mean the plaintiffs have met their burden. *Etheridge v. Hammer*, 450 S.W.2d 207, 210 (Mo. 1970).

First we will consider plaintiffs' constructive trust theory. The rule of law governing the imposition of a constructive trust due to failure of an oral trust for a

third person or failure of an agreement to convey to a third person in Missouri, according to *Etheridge v. Hammer, supra,* is found under RESTATEMENT OF RESTITUTION § 183 (1937) which reads:

Where the owner of an interest in land transfers it inter vivos to another upon an oral trust in favor of a third person or upon an oral agreement to convey the land to a third person, and the trust or agreement is unenforceable because of the Statute of Frauds and the transferee refuses to perform the trust or agreement, he holds the interest upon a constructive trust for the third person, if, but only if,

(a) the transferee by fraud, duress or undue influence induced the transferor not to create an enforceable interest in the third person, or

(b) the transferee at the time of the transfer was in a confidential relation to the transferor, or

(c) the transfer was made by the transferor in contemplation of death.

Under this theory, plaintiffs carry a very heavy burden of proof. They must show not only the existence of an agreement between Darius and Joe and Meda, but also the existence of one of the three implementing provisions. The existence of an agreement, without more is insufficient. *Estate of Sheets v. Sheets,* 558 S.W.2d 291, 295 (Mo.App.1977). "The evidence must be so unquestionable in its character, so clear, cogent and convincing that no reasonable doubt can be entertained as to its truth and the existence of the trust." *Aronson v. Spitcaufsky,* 260 S.W.2d 548, 549 (Mo. 1953). Accord, *Swon v. Huddleston,* 282 S.W.2d 18, 25 (Mo.1955); *In Re Estate of Bennett v. Mulvania,* 618 S.W.2d 280, 284 (Mo.App.1981).

The initial question concerns whether or not plaintiffs proved an agreement between Darius and Joe and Meda. The evidence follows:

The parties agree that Joe was a friendly, talkative person who especially enjoyed talking about his farm. It was not unusual for Joe to make the kinds of statements which were the subject of testimony. Deloris Brown lived on the farm nine years and wanted to buy the house where she was living from Joe. She testified:

[Joe] told me the land was not his to sell. The land belonged to Tommy and Johnny. Then he went and told me about this agreement he had made years and years ago. ... He told me that he had gotten the land from his father and this was the agreement. This was how he got the land. He got the land that down the line that this land would be passed on to Tommy and Johnny. Therefore, he could not sell us any land.

Darius Crane had already died when Deloris moved to the farm, and Joe told her that his father had had the right "to live there as long as he lived." Joe made statements similar to those above "probably 10, 15 times."

Ray Nobel lived on the farm approximately nine years and testified by deposition that Joe was like his adopted grandfather; he saw Joe "about every day." When asked about whether Joe ever spoke of his ownership of the farm being limited, Ray testified, "He said the farm was to stay within the Crane family, and that he couldn't even sell a section of the land. It was his to hand on to Tom and John." Joe also made the statement to Ray that the farm "wasn't his to sell." About the agreement, Ray testified, "Everybody knew that's the way it was supposed to be."

John Brown, husband of Deloris Brown, testified:

Well, I tried to purchase a piece of ground, the land there where the house was, and he said it was not—he couldn't do it. It was not his to sell.... It was an agreement made between he and his dad that the farm went to Tom and Joe [sic] and he couldn't sell it."

Joe made such statements to John Brown "probably half a dozen times."

Margaret Easley, a long-time neighbor of Joe Crane, testified that Joe "said several times, number of times, that the farm was

supposed to stay in the Crane family.... He said one side of the road went to Tom and the other side to John."

Shannon Davis, an old friend and co-worker of Joe, testified, "[Joe] had always wanted the farm and, that him and his dad had made an agreement that he could buy the place there." When asked about the price, Shannon testified, "He said he got it cheap, because "[h]is father wanted it left in the Crane name." Joe never told Shannon who the recipients of the land were to be, but at some time after Joe and Meda executed their joint will, he told Shannon that he and Meda "had everything fixed, that it was settled what was going to happen to the farm when he died." As noted, the joint will left the farm to Tom and John.

Hartley Banks, past president of the defendant Centerre Bank in Columbia, was a boyhood friend of Tom Crane. He recalled hearing statements from Joe to the effect that Tom and John were going to get the farm.

Vera Crane, who was the wife of Henry and the mother of Tom and John, testified that she and Henry had also wanted to purchase the farm. The sale of the farm to Joe occurred while Henry was in the service. The morning after Joe bought the farm Vera went to see him at work. She testified that "tears were streaming down his checks" and he said, "Vera, we bought the farm last night.... But don't you worry.... We promised Dad it would be your boys when we are through with it." At another time, Joe told Vera and Henry that a man named Epple had offered Darius more money for the farm, but he sold it to Joe "so it would stay in the family."

Defense witness Nell Proctor, who is the daughter of Darius and who has children who are beneficiaries under Meda's trust, also confirmed the existence of an oral agreement, although with slightly different terms. Her testimony as to a conversation between Darius and her was as follows: "he says, 'Well Nell, I sold the°farm.' and I said 'Well, who to?' and he said, 'I gave it to Joe so he could give it to my grandchil-

dren when he gets through with it.'" Darius did not tell Nell specifically to which grandchildren he was referring. The conversation continued with Nell stating, "'Well, I thought Epple wanted to buy it and would give you more money than you got for it' and he said, 'Well, he did, but I thought Joe could take it and use it as long as he was living and he would give it to my grandchildren then—....'" Nell said she had heard about Epple "through the grapevine." Nell testified that when she asked her father whether he made Joe sign any papers, he said, "No, I didn't. I thought my son was honest and I don't know whether he is going to be or not." Nell spoke with Henry, who was her brother, and the plaintiff's father, about her concern over having the proper papers signed. Henry agreed to speak to Joe. Joe told Henry that if Henry "wouldn't make a fuss over it," he "would leave the farm part to Johnny and Tommy Crane." Nell told Henry, "that wasn't the way it was supposed to be," but objected no further.

There was also testimony showing that Meda, Joe's wife, knew of the agreement. Both Mr. and Mrs. Brown and Ray Noble all remembered one or more instances when the agreement was described in front of Meda and she replied. "that's right" or "I know how that's set up." Vera Crane, mother of the plaintiffs, testified that Meda made statements regarding the portion of the farm where the house was located such as, "I want John to take good care of these flowers when he gets this part of the farm and not tear up any of my pretty bushes or anything," and, "John will have this yard to take care of." After Joe died, Meda said, "Those boys will have this farm when I'm through with it."

Meda lived with Vera for six weeks after Joe's death and Vera testified to conversations with Meda during that time: "She would tell me the same thing she said about the flowers and that Tommy could farm better, so he could have the 160 acres and John would live on the homeplace and just make plans about them living out there." After Meda left Vera's home, she

telephoned Vera and said, "I'm having an awful time taking care of things out on the farm, but I'm going to keep it." Meda did sell all of her other property including two homes and all of the cattle, farm equipment and machinery.

Plaintiffs attempted to show the sale of the farm was for a price well below the fair market value as evidence of consideration for the agreement. There is a conflict as to both the amount Joe paid for the farm and the fair market value of the farm at the time of the sale in 1945. The trial judge found the sale price to be anywhere from $8,000 to $13,000 and noted the amount was "substantial." Plaintiff's expert witness appraised the fair market value of the farm as of 1945 to be $42,000 less $4,835, the value of the reserved life estate. Defendant's expert witness appraised the value of the farm to be $45 to $50 an acre, or $10,800 to $12,000. Defense witness Nell Proctor testified that Epple had offered to pay more money than Joe for the property. Plaintiff's witnesses John and Deloris Brown, and Shannon Davis testified that Joe got the farm "cheap" or "down the line."

■ Joe's statement that, "the land is not mine to sell, it belongs to Tommy and Johnny," coupled with his references to "an agreement he made and years ago" with his father, are strong indications that such an agreement did exist. However, evidence showing that Meda entered into the agreement to convey to Tom and John is lacking. The trial court rejected the evidence as not being clear, cogent and convincing. The finding was correct. Also, defendant's evidence tends to negate the existence of the agreement plaintiffs offer to prove: The deed was absolute on its face; the joint will provided that either Joe or Meda could revoke; Joe told Henry that *if* he "wouldn't make a fuss," he would leave the farm to Tom and John.

Regardless of whether or not this court would reverse the trial court's failure to find an agreement, plaintiffs could not prevail absent a strong showing of a confidential relationship between Darius and Joe and Meda, or that Darius transferred the property in contemplation of death. *Etheridge v. Hammer, supra,* at 210–11. Plaintiffs did not plead nor seek to prove the transfer was induced by fraud, duress, or undue influence.

■ A confidential relationship is generally synonomous with a fiduciary relationship. *Harlan v. Bishoff,* 649 S.W.2d 230, 233 (Mo.App.1983). The relationship need not be "technically fiduciary" but may be "merely informal". *Jackson v. Tibbling,* 310 S.W.2d 909, 916 (Mo.1958). It will exist "where a *special confidence is reposed on one side with a resulting influence on the other.* 'The question is always whether or not trust is reposed with respect to property or business affairs of the other.' *Service Life Insurance Co. of Fort Worth v. Davis,* 466 S.W.2d 190, 196 (Mo.App.1971)." *Harlan v. Bishoff, supra,* at 233, quoting from *Mahler v. Tieman,* 550 S.W.2d 623, 628 (Mo.App.1977). The family relationship may be considered as evidence of a confidential relationship but is not decisive. *Harlan v. Bishoff,* at 233.

Plaintiffs contend the strongest evidence showing the relationship to be Darius' statement to Nell that "he thought his son was an honest man." Plaintiffs' contention is based on their above interpretation of Nell's actual testimony which reads, "I thought my son was honest and I don't know if he is going to be or not." When read in full the statement is ambiguous. Other evidence was the testimony of Vera Crane that Joe took money to the bank for Darius; Joe was the only one of the twelve children that farmed; Darius and Joe were father and son; Joe counted Darius' bonds at one time, but was not in possession of the bonds; Joe and Darius belonged to the same church; Joe saw that his father bathed and changed his clothes in his later years; Darius bought a single share of stock in Joe's farm cooperative; Darius sold the farm to Joe at a price substantially below its market value. Vera Crane testified that her husband, Henry, had been very close to Darius, farming with him,

banking for him, acting as executor of his estate, keeping his bonds, and when Henry went into the service, Joe took his place. However, the evidence simply does not show Darius reposed the same special confidence in Joe which he did in Henry.

The common thread woven through Missouri cases where a confidential relationship was found is that the person in whom confidence is reposed had either control or influence over at least a portion of the transferor's property, finances, or business affairs. The cases purporting to support plaintiffs' cause contain this element: *Harlan v. Bishoff, supra,; Jackson v. Tibbling, supra,; Mahler v. Tieman, supra.* Plaintiffs cite *Phillips v. Phillips,* 50 Mo. 603 (1872) which is not on point. There, the *grantee* of deeds to land sought to quiet title to the property after the death of the grantor. The deeds were missing, but the court noted that the transaction was "established by the clearest evidence." *Phillips,* at 695. The court did not rule on the outcome if the alleged third party beneficiaries to the land transfer had instituted the litigation.

■ Plaintiffs have failed to demonstrate by cogent, clear and convincing evidence that Joe's relationship with Darius was different from any other father-son relationship, and the law undeniably dictates that this evidence, standing alone, is insufficient to establish a confidential relationship under the theory of constructive trust. The facts were uncontested. The trial court acknowledged the evidence in its finding of facts but concluded the evidence failed to show a confidential relationship clear, cogent, and convincing evidence. This court cannot upset this conclusion except with a firm belief that it was wrong, *Murphy v. Carron, supra.* Point II is denied.

Alternatively, plaintiffs claim Darius transferred the property in contemplation of his death. The evidence shows that at the time of the transfer Darius was eighty-three years of age and, according to actuarial tables, had exceeded his life expectancy at birth by 41.5 years. A few months before the transfer, Darius suffered a spell of illness in a field and Vera Crane testified that he fell down and was unable to get up for two hours. At the time of the transfer, he was able to work only for limited periods due to shortness of breath and, after 1944, no witness actually saw Darius do any work on the farm. Plaintiffs unsuccessfully attempted to introduce evidence through the testimony of Tom Crane that Darius would cry out at night, "I'll be there soon, Roxie Lee." Approximately two years after the land transfer, Darius died of a heart and arterial condition which had developed over a number of years.

According to Vera, Darius viewed the distribution of his wife's estate into many small shares as undesirable. Plaintiffs argue this makes it reasonable and probable that his conveyance to Joe was a substitute for his earlier testamentary disposition, a will which directed the executor to sell the farm if necessary. Also, plaintiffs argue that the retention of a life estate is the "hallmark" of a testamentary disposition.

Defendant's witnesses testified, as did Vera Crane, that Darius was alert to the time of his death. Nell Proctor testified that she noticed no difference in Darius' speech, walk, or general physical health after his fall in the field. Darius lived alone on the farm until approximately two months before his death.

Missouri law contains little directive in the area of finding a constructive trust where the transfer was in contemplation of death.[1] *Janssen v. Christian,* 57 S.W.2d 692 (Mo.App.1933), is apparently such a case. In *Janssen,* the deceased deeded his home to his daughter a little over a month before he died. At the time of the transfer, he was in a "weakened and devitalized" condition, living in his daughter's

---

1. Plaintiffs cite *Gordon v. United States,* 163 F.Supp. 542 (W.D.Mo.1958), and *Commissioner of Internal Revenue v. Gidwitz' Estate,* 196 F.2d 813 (7th Cir.1952), which are inapplicable because they involve interpretation of the term "contemplation of death" as used in federal taxation law and not as a means of circumventing the Statute of Frauds.

home after spending a few weeks in the hospital because of serious illness. *Janssen*, at 693.

Both the Restatement of Trusts and the Restatement of Restitution provide for a finding of contemplation of death where "the transfer was made by the transferor in contemplation of death and intended by him as a substitute for a testamentary disposition." RESTATEMENT OF RESTITUTION § 183 (1937), comment f, at 742. Accord, RESTATEMENT (SECOND) OF TRUSTS § 45 (1959), comment d, at 121.

The Supreme Court of Arkansas, although not adopting the Restatement view applied the contemplation of death theory to the facts of the case in *Jones v. Gachot*, 217 Ark. 462, 230 S.W.2d 937 (1950). The court noted, "there was no more 'contemplation of death' on the part of Mrs. Field, the grantor, when she made the deed in question than there is such contemplation by any person of advanced years: she was both physically and mentally active at the time she had the attorney prepare the deed; she was not in extremis; she lived fourteen months after its delivery." *Id.* at 938.

■ The same can be said in the instant case. Darius continued to live for two years after the transfer. The evidence does not show he was in his last illness, expecting to die at any moment. It was not until two months before his death that his children believed he should move into town.

Plaintiffs have failed to meet their heavy burden. Point III is denied.

Plaintiffs next contend under Point IV, the trial court erred in excluding the hospital records of Meda Crane and the testimony of her physician on the basis of physician-patient privilege. They argue that the evidence was relevant because proof of a mental illness at the time she set up the trust would explain her actions.

The evidence does support the proposition that Meda became "peculiar" during her declining years, however, as noted by the trial court, the introduction of the tendered evidence would have had no effect on the outcome of this litigation. The inference plaintiffs sought to raise from the medical records is so remote that the evidence borders on being considered irrelevant. Plaintiffs were required to prove an agreement. Additionally, they were required to prove a confidential relationship between Darius and Joe and Meda or Darius transferred the land in contemplation of death. An explanation for breach of the agreement does little to further their argument. Therefore, this court need not consider whether beneficiaries of an inter vivos trust, the defendants, are entitled to assert the physician-patient privilege.

Plaintiffs also contend the trial court erred in excluding the proffered testimony of the plaintiffs on the basis of § 491.010, RSMo, the "Dead Man's Statute."

■ The trial court erred in excluding that portion of the testimony concerning the plaintiffs' transactions with others or matters with which the deceased persons had no knowledge and connection. *Fellows v. Farmer*, 379 S.W.2d 842, 849–50 (Mo. App.1964). However, the major portion of the plaintiffs' testimony was incompetent and the competent portions were basically cumulative. The trial court found that even if the proffered testimony had been admitted, the result would remain unchanged and likewise, this court finds nothing within the erroneously excluded portion of the testimony which would upset the judgment of the trial court.

Plaintiffs also allege that their evidence was adequate to establish an express oral trust. They argue an express trust in land may be removed from the Statute of Frauds by full performance of one party, by adequate and substantial part performance, or by an adequate written memorandum. Plaintiffs seem to be combining the theory of express oral trust and the theory of oral contract to convey or devise into a single theory. After diligent research, this court concludes that it is extremely important to recognize the differences between the two theories where the plaintiff is a beneficiary of and not an original party to the agreement.

■ It is clear that in Missouri, full performance by one party to a contract to convey land could serve to remove the agreement from the Statute of Frauds, § 432.010, RSMo. *Grissum v. Reesman*, 505 S.W.2d 81, 88 (Mo.1974); *Gegg v. Kiefer*, 655 S.W.2d 834, 837 (Mo.App.1983). Likewise, an agreement to dispose of property by will in a particular way may be removed from the Statute of Frauds requirement if supported by valid consideration and partially performed so as to work a fraud on the performing party if not enforced. *Fuchs v. Fuchs*, 48 Mo.App. 18, 23 (1892).

Plaintiffs have cited no case where a third party beneficiary has sought to enforce an oral agreement to convey or devise land strictly on the basis of full or part performance by the original purchasing party.[2] It seems unlikely though, that a third party beneficiary would be allowed to enforce a contract which violates the Statute of Frauds. The rationale has been stated as, "where the *plaintiff* has partially performed, or has done other acts in reliance of such promises, and thereby has changed his position so materially ' ... to invoke the statute to deny the *performer* the benefit of the agreement would itself amount to a fraud.' *Jackson v. Shain*, 619 S.W.2d 860, 862 (Mo.App.1981)." *Gegg v. Kiefer, supra*, at 837. (Emphasis added.)

Professor Scott, in *Scott on Trusts*, § 50, at 372 (3d ed. 1967), addresses the part performance doctrine as it applies to plaintiff third party beneficiaries of an oral trust. He notes that there is some authority for allowing the third party beneficiary to take advantage of the doctrine, but only where the beneficiary has gone into possession of the land or has otherwise exercised dominion over the land. See also: RESTATEMENT (SECOND) OF TRUSTS § 50. This view is consistent with the notion that the third party should not be permitted to rely merely on the actions of the original parties.

■ Even though until the time Meda set up the contested trust, Darius, Joe and Meda had performed every act necessary to complete the alleged agreement, plaintiffs should not prevail under their theory of part or full performance.

In any event, *Gegg v. Kiefer, supra*, at 837, lists eight elements of proof required before enforcement of an oral contract to convey realty would be sustained despite § 432.010. Plaintiffs clearly fail to meet the sixth requirement that "the work constituting performance must be such as is referable solely to the contract *as sought to be enforced* [the alleged agreement to convey or devise] and not such as might be reasonably referable to *some other and different contract* [the absolute sale to Joe and Meda]." *Id.* (Emphasis added.)

Section 456.010, RSMo, requires that all declarations of trust in land must be in writing or they shall be void. The principle is well established that the beneficiary of such a trust may seek its enforcement by proving the existence of one of the three provisions under RESTATEMENT OF RESTITUTION § 183 as set forth earlier. Likewise, Missouri courts have recognized that such a trust may be enforceable by the existence of an adequate written memorandum. *Ervin v. Davis*, 355 Mo. 951, 199 S.W.2d 366 (1947); *Stephenson v. Stephenson*, 351 Mo. 8, 171 S.W.2d 565 (1943); *Ketcham v. Miller*, 37 S.W.2d 635 (Mo. 1931).

Plaintiffs claim the will executed by Joe and Meda is sufficient memorandum to satisfy the Statute of Frauds. However, *Jackson v. Tibbling, supra*, at 914, forecloses their contention by the following language:

> The provisions of the will indicate the intention of Mr. Tibbling, at the time of its execution, to carry out what the evidence shows to have been the oral agreement. But, the provisions of the will, when considered alone, or considered to-

**2.** *Fuchs v. Fuchs, supra*, is distinguishable because there, the plaintiff's rights in contract

were derived through her deceased father.

gether with the provisions of the deed, do not contain an agreement to reconvey the property, nor do they contain any declaration of an express trust. The terms of the will, absent the parol evidence, are consistent with a voluntary devise on the part of Mr. Tibbling, which, of course, was subject to revocation during his lifetime. Therefore, when the oral agreement between plaintiff and Mr. Tibbling is considered an express agreement to convey real estate, it is unenforceable by reason of the Statute of Frauds, Section 432.010 ... and when considered as an express trust, it is "void" by reason of Section 456.010.

Therefore, plaintiffs have failed to prove an express trust by adequate written memorandum.

Judgment is affirmed.

All concur.